# UNITED STATES *v.* ARMSTRONG ET AL.

No. 95–157.   Argued February 26, 1996—Decided May 13, 1996

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined,
and in which BREYER, J., joined in part. SOUTER, J., *post*, p. 471, and
GINSBURG, J., *post*, p. 471, filed concurring opinions. BREYER, J., filed an
opinion concurring in part and concurring in the judgment, *post*, p. 471.
STEVENS, J., filed a dissenting opinion, *post*, p. 476.

*Solicitor General Days* argued the cause for the United
States. With him on the briefs were *Acting Assistant At-
torney General Keeney, Deputy Solicitor General Dreeben,
Irving L. Gornstein,* and *Kathleen A. Felton.*

*Barbara E. O'Connor,* by appointment of the Court, 516
U. S. 1007, argued the cause for respondents. With her
on the brief for respondents Martin et al. were *Maria
E. Stratton, Timothy C. Lannen,* by appointment of the
Court, 516 U. S. 1007, *David Dudley, Bernard J. Rosen,* and

*Eric Schnapper. Joseph F. Walsh,* by appointment of the Court, 516 U. S. 1007, filed a brief for respondent Rozelle.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case, we consider the showing necessary for a defendant to be entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race. We conclude that respondents failed to satisfy the threshold showing: They failed to show that the Government declined to prosecute similarly situated suspects of other races.

In April 1992, respondents were indicted in the United States District Court for the Central District of California on charges of conspiring to possess with intent to distribute more than 50 grams of cocaine base (crack) and conspiring to distribute the same, in violation of 21 U. S. C. §§ 841 and 846 (1988 ed. and Supp. IV), and federal firearms offenses. For three months prior to the indictment, agents of the Federal Bureau of Alcohol, Tobacco, and Firearms and the Narcotics Division of the Inglewood, California, Police Department had infiltrated a suspected crack distribution ring by using three confidential informants. On seven separate occasions during this period, the informants had bought a total of 124.3 grams of crack from respondents and witnessed respondents carrying firearms during the sales. · The agents searched the hotel room in which the sales were transacted, arrested respondents Armstrong and Hampton in the room, and found

*Briefs of *amici curiae* urging reversal were filed for the Criminal Justice Legal Foundation by *Kent F. Scheidegger;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for former law enforcement officials and police organizations et al. by *David Cole;* for the National Association of Criminal Defense Lawyers by *Judy Clarke* and *Nancy Hollander;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Elaine R. Jones, Theodore M. Shaw, George H. Kendall,* and *Steven R. Shapiro.*

more crack and a loaded gun. The agents later arrested the other respondents as part of the ring.

In response to the indictment, respondents filed a motion for discovery or for dismissal of the indictment, alleging that they were selected for federal prosecution because they are black. In support of their motion, they offered only an affidavit by a "Paralegal Specialist," employed by the Office of the Federal Public Defender representing one of the respondents. The only allegation in the affidavit was that, in every one of the 24 § 841 or § 846 cases closed by the office during 1991, the defendant was black. Accompanying the affidavit was a "study" listing the 24 defendants, their race, whether they were prosecuted for dealing cocaine as well as crack, and the status of each case.[1]

The Government opposed the discovery motion, arguing, among other things, that there was no evidence or allegation "that the Government has acted unfairly or has prosecuted non-black defendants or failed to prosecute them." App. 150. The District Court granted the motion. It ordered the Government (1) to provide a list of all cases from the last three years in which the Government charged both cocaine and firearms offenses, (2) to identify the race of the defendants in those cases, (3) to identify what levels of law enforcement were involved in the investigations of those cases, and (4) to explain its criteria for deciding to prosecute those defendants for federal cocaine offenses. *Id.*, at 161–162.

The Government moved for reconsideration of the District Court's discovery order. With this motion it submitted af-

---

[1] Other defendants had introduced this study in support of similar discovery motions in at least two other Central District cocaine prosecutions. App. 83. Both motions were denied. One District Judge explained from the bench that the 23-person sample before him was "statistically insignificant," and that the evidence did not indicate "whether there is a bias in the distribution of crime that says black people use crack cocaine, hispanic people use powdered cocaine, caucasian people use whatever it is they use." *Id.*, at 119, 120.

fidavits and other evidence to explain why it had chosen to prosecute respondents and why respondents' study did not support the inference that the Government was singling out blacks for cocaine prosecution. The federal and local agents participating in the case alleged in affidavits that race played no role in their investigation. An Assistant United States Attorney explained in an affidavit that the decision to prosecute met the general criteria for prosecution, because

> "there was over 100 grams of cocaine base involved, over twice the threshold necessary for a ten year mandatory minimum sentence; there were multiple sales involving multiple defendants, thereby indicating a fairly substantial crack cocaine ring; . . . there were multiple federal firearms violations intertwined with the narcotics trafficking; the overall evidence in the case was extremely strong, including audio and videotapes of defendants; . . . and several of the defendants had criminal histories including narcotics and firearms violations." *Id.*, at 81.

The Government also submitted sections of a published 1989 Drug Enforcement Administration report which concluded that "[l]arge-scale, interstate trafficking networks controlled by Jamaicans, Haitians and Black street gangs dominate the manufacture and distribution of crack." J. Featherly & E. Hill, Crack Cocaine Overview 1989; App. 103.

In response, one of respondents' attorneys submitted an affidavit alleging that an intake coordinator at a drug treatment center had told her that there are "an equal number of caucasian users and dealers to minority users and dealers." *Id.*, at 138. Respondents also submitted an affidavit from a criminal defense attorney alleging that in his experience many nonblacks are prosecuted in state court for crack offenses, *id.*, at 141, and a newspaper article reporting that federal "crack criminals . . . are being punished far more severely than if they had been caught with powder cocaine,

and almost every single one of them is black," Newton, Harsher Crack Sentences Criticized as Racial Inequity, Los Angeles Times, Nov. 23, 1992, p. 1; App. 208–210.

The District Court denied the motion for reconsideration. When the Government indicated it would not comply with the court's discovery order, the court dismissed the case.[2]

A divided three-judge panel of the Court of Appeals for the Ninth Circuit reversed, holding that, because of the proof requirements for a selective-prosecution claim, defendants must "provide a colorable basis for believing that 'others similarly situated have not been prosecuted'" to obtain discovery. 21 F. 3d 1431, 1436 (1994) (quoting *United States* v. *Wayte*, 710 F. 2d 1385, 1387 (CA9 1983), aff'd, 470 U. S. 598 (1985)). The Court of Appeals voted to rehear the case en banc, and the en banc panel affirmed the District Court's order of dismissal, holding that "a defendant is not required to demonstrate that the government has failed to prosecute others who are similarly situated." 48 F. 3d 1508, 1516 (1995) (emphasis deleted). We granted certiorari to determine the appropriate standard for discovery for a selective-prosecution claim. 516 U. S. 942 (1995).

Neither the District Court nor the Court of Appeals mentioned Federal Rule of Criminal Procedure 16, which by its terms governs discovery in criminal cases. Both parties now discuss the Rule in their briefs, and respondents contend that it supports the result reached by the Court of Appeals. Rule 16 provides, in pertinent part:

> "Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects,

---

[2] We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race. Here, "it was the government itself that suggested dismissal of the indictments to the district court so that an appeal might lie." 48 F. 3d 1508, 1510 (CA9 1995).

> buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant." Fed. Rule Crim. Proc. 16(a)(1)(C).

Respondents argue that documents "within the possession ... of the government" that discuss the Government's prosecution strategy for cocaine cases are "material" to respondents' selective-prosecution claim. Respondents argue that the Rule applies because any claim that "results in nonconviction" if successful is a "defense" for the Rule's purposes, and a successful selective-prosecution claim has that effect. Tr. of Oral Arg. 30.

We reject this argument, because we conclude that in the context of Rule 16 "the defendant's defense" means the defendant's response to the Government's case in chief. While it might be argued that as a general matter, the concept of a "defense" includes any claim that is a "sword," challenging the prosecution's conduct of the case, the term may encompass only the narrower class of "shield" claims, which refute the Government's arguments that the defendant committed the crime charged. Rule 16(a)(1)(C) tends to support the "shield-only" reading. If "defense" means an argument in response to the prosecution's case in chief, there is a perceptible symmetry between documents "material to the preparation of the defendant's defense," and, in the very next phrase, documents "intended for use by the government as evidence in chief at the trial."

If this symmetry were not persuasive enough, subdivision (a)(2) of Rule 16 establishes beyond peradventure that "defense" in subdivision (a)(1)(C) can refer only to defenses in response to the Government's case in chief. Rule 16(a)(2), as relevant here, exempts from defense inspection "reports, memoranda, or other internal government documents made

by the attorney for the government or other government agents in connection with the investigation or prosecution of the case."

Under Rule 16(a)(1)(C), a defendant may examine documents material to his defense, but, under Rule 16(a)(2), he may not examine Government work product in connection with his case. If a selective-prosecution claim is a "defense," Rule 16(a)(1)(C) gives the defendant the right to examine Government work product in every prosecution except his own. Because respondents' construction of "defense" creates the anomaly of a defendant's being able to examine all Government work product except the most pertinent, we find their construction implausible. We hold that Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims.

In *Wade* v. *United States*, 504 U. S. 181 (1992), we considered whether a federal court may review a Government decision not to file a motion to reduce a defendant's sentence for substantial assistance to the prosecution, to determine whether the Government based its decision on the defendant's race or religion. In holding that such a decision was reviewable, we assumed that discovery would be available if the defendant could make the appropriate threshold showing, although we concluded that the defendant in that case did not make such a showing. See *id.*, at 186. We proceed on a like assumption here.

A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one. These cases afford a "background presumption," cf. *United States* v. *Mezzanatto*, 513 U. S. 196, 203

(1995), that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims.

A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. *Heckler* v. *Chaney*, 470 U. S. 821, 832 (1985). The Attorney General and United States Attorneys retain "'broad discretion'" to enforce the Nation's criminal laws. *Wayte* v. *United States*, 470 U. S. 598, 607 (1985) (quoting *United States* v. *Goodwin*, 457 U. S. 368, 380, n. 11 (1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U. S. Const., Art. II, §3; see 28 U. S. C. §§516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher* v. *Hayes*, 434 U. S. 357, 364 (1978).

Of course, a prosecutor's discretion is "subject to constitutional constraints." *United States* v. *Batchelder*, 442 U. S. 114, 125 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, *Bolling* v. *Sharpe*, 347 U. S. 497, 500 (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons . . . with a mind so unequal and

oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373 (1886).

In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Chemical Foundation, supra*, at 14–15. We explained in *Wayte* why courts are "properly hesitant to examine the decision whether to prosecute." 470 U. S., at 608. Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.*, at 607. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Ibid.*

The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." *Id.*, at 608. The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Ibid.*; accord, *Oyler, supra*, at 456. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. This requirement has been established in our case law since *Ah Sin* v. *Wittman*, 198 U. S. 500 (1905). Ah Sin, a subject of China, petitioned a California state court for a writ of habeas corpus, seeking discharge from imprisonment under a San Francisco County

ordinance prohibiting persons from setting up gambling tables in rooms barricaded to stop police from entering. *Id.*, at 503. He alleged in his habeas petition "that the ordinance is enforced 'solely and exclusively against persons of the Chinese race and not otherwise.'" *Id.*, at 507. We rejected his contention that this averment made out a claim under the Equal Protection Clause, because it did not allege "that the conditions and practices to which the ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese as to whom it was not enforced." *Id.*, at 507–508.

The similarly situated requirement does not make a selective-prosecution claim impossible to prove. Twenty years before *Ah Sin*, we invalidated an ordinance, also adopted by San Francisco, that prohibited the operation of laundries in wooden buildings. *Yick Wo*, 118 U. S., at 374. The plaintiff in error successfully demonstrated that the ordinance was applied against Chinese nationals but not against other laundry-shop operators. The authorities had denied the applications of 200 Chinese subjects for permits to operate shops in wooden buildings, but granted the applications of 80 individuals who were not Chinese subjects to operate laundries in wooden buildings "under similar conditions." *Ibid.* We explained in *Ah Sin* why the similarly situated requirement is necessary:

> "No latitude of intention should be indulged in a case like this. There should be certainty to every intent. Plaintiff in error seeks to set aside a criminal law of the State, not on the ground that it is unconstitutional on its face, not that it is discriminatory in tendency and ultimate actual operation as the ordinance was which was passed on in the *Yick Wo case*, but that it was made so by the manner of its administration. This is a matter of proof, and *no fact should be omitted to make it out completely*, when the power of a Federal court is in-

voked to interfere with the course of criminal justice of a State." 198 U. S., at 508 (emphasis added).

Although *Ah Sin* involved federal review of a state conviction, we think a similar rule applies where the power of a federal court is invoked to challenge an exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute.

Respondents urge that cases such as *Batson* v. *Kentucky*, 476 U. S. 79 (1986), and *Hunter* v. *Underwood*, 471 U. S. 222 (1985), cut against any absolute requirement that there be a showing of failure to prosecute similarly situated individuals. We disagree. In *Hunter*, we invalidated a state law disenfranchising persons convicted of crimes involving moral turpitude. *Id.*, at 233. Our holding was consistent with ordinary equal protection principles, including the similarly situated requirement. There was convincing direct evidence that the State had enacted the provision for the purpose of disenfranchising blacks, *id.*, at 229–231, and indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites: Blacks were "'by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under'" the law in question, *id.*, at 227 (quoting *Underwood* v. *Hunter*, 730 F. 2d 614, 620 (CA11 1984)). *Hunter* thus affords no support for respondents' position.

In *Batson*, we considered "[t]he standards for assessing a prima facie case in the context of discriminatory selection of the venire" in a criminal trial. 476 U. S., at 96. We required a criminal defendant to show "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race" and that this fact, the potential for abuse inherent in a peremptory strike, and "any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Ibid.* During jury selection, the entire *res gestae* take place in front of the trial

judge. Because the judge has before him the entire venire, he is well situated to detect whether a challenge to the seating of one juror is part of a "pattern" of singling out members of a single race for peremptory challenges. See *id.*, at 97. He is in a position to discern whether a challenge to a black juror has evidentiary significance; the significance may differ if the venire consists mostly of blacks or of whites. Similarly, if the defendant makes out a prima facie case, the prosecutor is called upon to justify only decisions made in the very case then before the court. See *id.*, at 97–98. The trial judge need not review prosecutorial conduct in relation to other venires in other cases.

Having reviewed the requirements to prove a selective-prosecution claim, we turn to the showing necessary to obtain discovery in support of such a claim. If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.

The parties, and the Courts of Appeals which have considered the requisite showing to establish entitlement to discovery, describe this showing with a variety of phrases, like "colorable basis," "substantial threshold showing," Tr. of Oral Arg. 5, "substantial and concrete basis," or "reasonable likelihood," Brief for Respondents Martin et al. 30. However, the many labels for this showing conceal the degree of consensus about the evidence necessary to meet it. The Courts of Appeals "require some evidence tending to show the existence of the essential elements of the defense," discriminatory effect and discriminatory intent. *United States v. Berrios*, 501 F. 2d 1207, 1211 (CA2 1974).

In this case we consider what evidence constitutes "some evidence tending to show the existence" of the discriminatory effect element. The Court of Appeals held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the defendant. 48 F. 3d, at 1516. We think it was mistaken in this view. The vast majority of the Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law. *United States* v. *Parham*, 16 F. 3d 844, 846–847 (CA8 1994); *United States* v. *Fares*, 978 F. 2d 52, 59–60 (CA2 1992); *United States* v. *Peete*, 919 F. 2d 1168, 1176 (CA6 1990); *C. E. Carlson, Inc.* v. *SEC*, 859 F. 2d 1429, 1437–1438 (CA10 1988); *United States* v. *Greenwood*, 796 F. 2d 49, 52–53 (CA4 1986); *United States* v. *Mitchell*, 778 F. 2d 1271, 1277 (CA7 1985). As the three-judge panel explained, " '[s]elective prosecution' implies that a selection has taken place." 21 F. 3d, at 1436.[3]

The Court of Appeals reached its decision in part because it started "with the presumption that people of *all* races commit *all* types of crimes—not with the premise that any type of crime is the exclusive province of any particular racial or ethnic group." 48 F. 3d, at 1516–1517. It cited no authority for this proposition, which seems contradicted by the most recent statistics of the United States Sentencing Commission. Those statistics show: More than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black, United States Sentencing Comm'n, 1994 Annual Report 107 (Table 45); 93.4% of convicted LSD dealers were white, *ibid.*; and 91% of those convicted for pornography or prostitution were white, *id.*, at 41 (Table 13). Presumptions

---

[3] We reserve the question whether a defendant must satisfy the similarly situated requirement in a case "involving direct admissions by [prosecutors] of discriminatory purpose." Brief for United States 15.

at war with presumably reliable statistics have no proper place in the analysis of this issue.

The Court of Appeals also expressed concern about the "evidentiary obstacles defendants face." 48 F. 3d, at 1514. But all of its sister Circuits that have confronted the issue have required that defendants produce some evidence of differential treatment of similarly situated members of other races or protected classes. In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents. For instance, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court. We think the required threshold—a credible showing of different treatment of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.

In the case before us, respondents' "study" did not constitute "some evidence tending to show the existence of the essential elements of" a selective-prosecution claim. *Berrios, supra,* at 1211. The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted. This omission was not remedied by respondents' evidence in opposition to the Government's motion for reconsideration. The newspaper article, which discussed the discriminatory effect of federal drug sentencing laws, was not relevant to an allegation of discrimination in decisions to prosecute. Respondents' affidavits, which recounted one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court, recounted hearsay and reported personal conclusions based on anecdotal evidence. The judgment of the Court of Appeals is therefore

reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, concurring.

I join the Court's opinion, but in its discussion of Federal Rule of Criminal Procedure 16 only to the extent of its application to the issue in this case.

JUSTICE GINSBURG, concurring.

I do not understand the Court to have created a "major limitation" on the scope of discovery available under Federal Rule of Criminal Procedure 16. See *post,* at 475 (BREYER, J., concurring in part and concurring in judgment). As I see it, the Court has decided a precise issue: whether the phrase "defendant's defense," as used in Rule 16(a)(1)(C), encompasses allegations of selective prosecution. I agree with the Court, for reasons the opinion states, that subdivision (a)(1)(C) does not apply to selective prosecution claims. The Court was not called upon to decide here whether Rule 16(a)(1)(C) applies in any other context, for example, to affirmative defenses unrelated to the merits. With the caveat that I do not read today's opinion as precedent foreclosing issues not tendered for review, I join the Court's opinion.

JUSTICE BREYER, concurring in part and concurring in the judgment.

I write separately because, in my view, Federal Rule of Criminal Procedure 16 does not limit a defendant's discovery rights to documents related to the Government's case in chief. *Ante,* at 462–463. The Rule says that "the government shall permit the defendant to inspect and copy" certain physical items (I shall summarily call them "documents") "which are material to the preparation of the defendant's defense." Fed. Rule Crim. Proc. 16(a)(1)(C). A "defendant's defense" can take many forms, including (1) a simple re-

sponse to the Government's case in chief, (2) an affirmative defense unrelated to the merits (such as a Speedy Trial Act claim), (3) an unrelated claim of constitutional right, (4) a foreseeable surrebuttal to a likely Government rebuttal, and others. The Rule's language does not limit its scope to the first item on this list. To interpret the Rule in this limited way creates a legal distinction that, from a discovery perspective, is arbitrary. It threatens to create two full parallel sets of criminal discovery principles. And, as far as I can tell, the interpretation lacks legal support.

The Court bases its interpretation upon what it says is a "perceptible symmetry," *ante*, at 462, between two phrases in Rule 16(a)(1)(C)—the phrase "material to the preparation of the defendant's defense," and the next phrase, "intended for use by the government as evidence in chief at the trial." To test the Court's argument, consider these two phrases in context. The Rule says:

> "Upon request of the defendant the government shall permit the defendant to inspect and copy [documents and other items] . . . which [1] are material to the preparation of the defendant's defense or [2] are intended for use by the government as evidence in chief at the trial, or [3] were obtained from or belong to the defendant." Fed. Rule Crim. Proc. 16(a)(1)(C).

Though symmetry may reside in the eye of the beholder, I can find no relevant symmetry here. Rather, the language suggests a simple three-part categorization of the documents and other physical items that the Rule requires the Government to make available to the defendant. From a purely linguistic perspective, there is no more reason to import into the first category a case-in-chief-related limitation (from the second category) than some kind of defendant's-belongings-related limitation (from the third category).

Rule 16 creates these three categories for a reason that belies "symmetry"—namely, to specify two sets of items (the

Government's case in chief evidence, the defendant's belongings) that the Government must make available to the defendant without a preliminary showing of "materiality." The Rule's first category creates a residual classification (items "material to the preparation of the defendant's defense") that require a preliminary "materiality" showing. The Committee thought, however, that "[l]imiting the rule to situations in which the defendant can show that the evidence is material seems unwise. . . . For this reason subdivision (a)(1)(C) also contains language to compel disclosure if the government intends to use the property as evidence at the trial or if the property was obtained from or belongs to the defendant." Advisory Committee's Notes on Fed. Rule Crim. Proc. 16, 18 U. S. C. App., p. 762 (second and third categories added to specify that, *without a special showing of materiality*, certain items are almost always "material") (citing 1 C. Wright, Federal Practice and Procedure § 254, p. 510, n. 58, p. 513, n. 70 (1969)). Nothing in the Notes, or in the Rule's language, suggests that the residual category of items "material to the preparation of the defendant's defense," means to cover only those items related to the case in chief.

The only other reason the majority advances in support of its "case in chief" limitation concerns a later part of the Rule, subdivision 16(a)(2). As relevant here, that subdivision exempts Government attorney work product from certain of Rule 16's disclosure requirements. In the majority's view, since (1) a defendant asserting a valid "selective prosecution" defense would likely need prosecution work product to make his case, but (2) the Rule exempts prosecution work product from discovery, then (3) the Rule must have some kind of implicit limitation (such as a "case in chief" limitation) that makes it irrelevant to defense efforts to assert "selective prosecution" defenses.

The majority's conclusion, however, does not follow from its premises. For one thing, Rule 16's work-product excep-

tion may itself contain implicit exceptions. After all, "[t]he privilege derived from the work-product doctrine is not absolute." *United States* v. *Nobles,* 422 U. S. 225, 239 (1975); see also 8 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure §2022, p. 324 (2d ed. 1994) (in civil context, work product "is discoverable only on a substantial showing of 'necessity or justification'") (quoting *Hickman* v. *Taylor,* 329 U. S. 495, 510 (1947)); J. Ghent, Development, Since Hickman v. Taylor, of Attorney's "Work Product" Doctrine, 35 A. L. R. 3d 412, 465–469, § 25 (1971) (in civil context, work-product protection is not absolute, but is a "qualified privilege or immunity"). To the extent such a reading permits a defendant to obtain "work product" in an appropriate case (say, with a strong prima facie showing of selective prosecution), the Court's problem does not exist. Of course, to read the work-product exception as containing some such implicit exception itself represents a departure from the Rule's literal language. But, is it not far easier to believe the Rule's authors intended some such small implicit exception to an exception, consistent with the language and purpose of the Rule, than that they intended the very large exception created by the Court?

For another thing, even if one reads the work-product exception literally, the Court's problem disappears as long as courts can *supplement* Rule 16 discovery with discovery based upon *other* legal principles. The language of the work-product exception suggests the possibility of such supplementation, for it says, not that work product is "exemp[t]" from discovery, *ante,* at 462, but that "*this rule*" does not authorize discovery of the prosecutor's work product. Fed. Rule Civ. Proc. 16(a)(2). The Advisory Committee's Notes make clear that the Committee believed that *other* rules of law may authorize (or require) discovery not mentioned in the Rule. See, *e. g.,* Advisory Committee's Notes on Rule 16, 18 U. S. C. App., pp. 762, 763 (discussion of *Brady* v. *Maryland,* 373 U. S. 83 (1963), which the Rule does not cod-

ify); 18 U. S. C. App., p. 761 ("[Rule 16] is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases"); see also 2 C. Wright, Federal Practice and Procedure § 254, p. 81, and n. 60 (2d ed. 1982) ("Because Brady is based on the Constitution, it overrides court-made rules of procedure. Thus the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within Brady") (footnotes omitted). Of course, the majority, in a sense, reads the Rule as permitting supplementation, but it does more. It goes well beyond the *added* (say, constitutionally related) rule supplementation needed to overcome its problem; instead, it *shrinks* the Rule by unnecessarily creating a major limitation on its scope.

Finally, and in any event, here the defendants sought discovery of information that is not work product. See *ante*, at 459. Thus, we need not decide whether in an appropriate case it would be necessary to find an implicit exception to the language of Rule 16(a)(2), or to find an independent constitutional source for the discovery, or to look for some other basis.

In sum, neither the alleged "symmetry" in the structure of Rule 16(a)(1)(C), nor the work-product exception of Rule 16(a)(2), supports the majority's limitation of discovery under Rule 16(a)(1)(C) to documents related to the Government's "case in chief." Rather, the language and legislative history make clear that the Rule's drafters meant it to provide a broad authorization for defendants' discovery, to be supplemented if necessary in an appropriate case. Whether or not one can *also* find a basis for this kind of discovery in other sources of law, Rule 16(a)(1)(C) provides *one* such source, and we should consider whether the defendants' discovery request satisfied the Rule's requirement that the discovery be "material to the preparation of the defendant's defense."

I believe that the defendants' request did not satisfy this threshold. Were the "selective prosecution" defense valid in this case—*i. e.*, were there "clear evidence," *United States v. Chemical Foundation, Inc.*, 272 U. S. 1, 14 (1926), that the Federal Government's prosecutorial policy "had a discriminatory effect and . . . was motivated by a discriminatory purpose," *Wayte* v. *United States*, 470 U. S. 598, 608 (1985), it should have been fairly easy for the defendants to find, not only instances in which the Federal Government prosecuted African-Americans, but also some instances in which the Federal Government did not prosecute similarly situated caucasians. The defendants' failure to do so, for the reasons the Court sets forth, amounts to a failure to make the necessary threshold showing in respect to materiality. See 2 C. Wright, Federal Practice and Procedure § 254, pp. 66–67 (2d ed. 1982); *United States* v. *Balk*, 706 F. 2d 1056, 1060 (CA9 1983); *United States* v. *Johnson*, 577 F. 2d 1304, 1309 (CA5 1978); *United States* v. *Murdock*, 548 F. 2d 599, 600 (CA5 1977).

JUSTICE STEVENS, dissenting.

Federal prosecutors are respected members of a respected profession. Despite an occasional misstep, the excellence of their work abundantly justifies the presumption that "they have properly discharged their official duties." *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926). Nevertheless, the possibility that political or racial animosity may infect a decision to institute criminal proceedings cannot be ignored. *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962). For that reason, it has long been settled that the prosecutor's broad discretion to determine when criminal charges should be filed is not completely unbridled. As the Court notes, however, the scope of judicial review of particular exercises of that discretion is not fully defined. See *ante*, at 469, n. 3.

The United States Attorney for the Central District of California is a member and an officer of the bar of that District Court. As such, she has a duty to the judges of that Court to maintain the standards of the profession in the performance of her official functions. If a District Judge has reason to suspect that she, or a member of her staff, has singled out particular defendants for prosecution on the basis of their race, it is surely appropriate for the judge to determine whether there is a factual basis for such a concern. I agree with the Court that Rule 16 of the Federal Rules of Criminal Procedure is not the source of the District Court's power to make the necessary inquiry. I disagree, however, with its implicit assumption that a different, relatively rigid rule needs to be crafted to regulate the use of this seldom-exercised inherent judicial power. See Advisory Committee's Notes on Rule 16, 18 U. S. C. App., p. 761 (Rule 16 is "not intended to limit the judge's discretion to order broader discovery in appropriate cases").

The Court correctly concludes that in this case the facts presented to the District Court in support of respondents' claim that they had been singled out for prosecution because of their race were not sufficient to prove that defense. Moreover, I agree with the Court that their showing was not strong enough to give them a *right* to discovery, either under Rule 16 or under the District Court's inherent power to order discovery in appropriate circumstances. Like Chief Judge Wallace of the Court of Appeals, however, I am persuaded that the District Judge did not abuse her discretion when she concluded that the factual showing was sufficiently disturbing to require some response from the United States Attorney's Office. See 48 F. 3d 1508, 1520–1521 (CA9 1995). Perhaps the discovery order was broader than necessary, but I cannot agree with the Court's apparent conclusion that no inquiry was permissible.

The District Judge's order should be evaluated in light of three circumstances that underscore the need for judicial

478

vigilance over certain types of drug prosecutions. First, the Anti-Drug Abuse Act of 1986 and subsequent legislation established a regime of extremely high penalties for the possession and distribution of so-called "crack" cocaine.[1] Those provisions treat one gram of crack as the equivalent of 100 grams of powder cocaine. The distribution of 50 grams of crack is thus punishable by the same mandatory minimum sentence of 10 years in prison that applies to the distribution of 5,000 grams of powder cocaine.[2] The Sentencing Guidelines extend this ratio to penalty levels above the mandatory minimums: For any given quantity of crack, the guideline range is the same as if the offense had involved 100 times that amount in powder cocaine.[3] These penalties result in sentences for crack offenders that average three to eight times longer than sentences for comparable powder offenders.[4] United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 145 (Feb. 1995) (hereinafter Special Report).

---

[1] 100 Stat. 3207, 21 U. S. C. § 841 *et seq.*

[2] Compare 21 U. S. C. § 841(b)(1)(A)(iii) with § 841(b)(1)(A)(ii). Similarly, a mandatory 5-year sentence is prescribed for distribution of 500 grams of cocaine or 5 grams of crack. Compare § 841(b)(1)(B)(ii) with § 841(b)(1)(B)(iii). Simple possession of 5 grams of crack also produces a mandatory 5-year sentence. The maximum sentence for possession of *any* quantity of other drugs is one year. § 844(a).

With one prior felony drug offense, the sentence for distribution of 50 grams of crack is a mandatory 20 years to life. § 841(b)(1)(A). With two prior felony drug offenses, the sentence is a mandatory life term without parole. *Ibid.*

[3] See United States Sentencing Commission, Guidelines Manual § 2D1.1(c) (Nov. 1995) (USSG).

[4] Under the Guidelines, penalties increase at a slower rate than drug quantities. For example, 5 grams of heroin result in a base offense level of 14 (15–21 months) while 10 grams of heroin (double the amount) result in an offense level of 16 (21–27 months). USSG §§ 2D1.1(c)(13), (12). Thus, the 100-to-1 ratio does not translate into sentences that are 100 times as long.

Second, the disparity between the treatment of crack cocaine and powder cocaine is matched by the disparity between the severity of the punishment imposed by federal law and that imposed by state law for the same conduct. For a variety of reasons, often including the absence of mandatory minimums, the existence of parole, and lower baseline penalties, terms of imprisonment for drug offenses tend to be substantially lower in state systems than in the federal system. The difference is especially marked in the case of crack offenses. The majority of States draw no distinction between types of cocaine in their penalty schemes; of those that do, none has established as stark a differential as the Federal Government. See *id.*, at x, 129–138. For example, if respondent Hampton is found guilty, his federal sentence might be as long as a mandatory life term. Had he been tried in state court, his sentence could have been as short as 12 years, less worktime credits of half that amount.[5]

Finally, it is undisputed that the brunt of the elevated federal penalties falls heavily on blacks. While 65% of the persons who have used crack are white, in 1993 they

---

[5] Hampton was charged with conspiracy to distribute, four counts of crack distribution, and the use or carrying of a firearm in relation to a drug crime. According to an information filed by the Government, Hampton had three prior convictions for felony drug offenses. See Information Establishing Prior Felony Narcotics Convictions (June 24, 1992). Therefore, he potentially faces a mandatory life sentence on the drug charges alone.

Under California law at the time of the offenses, possession for sale of cocaine base involving 50 grams carried a penalty of imprisonment for either three, four, or five years. Cal. Health & Safety Code Ann. § 11351.5 (West 1988). If the defendant had no prior convictions, he could be granted probation. § 11370. For each prior felony drug conviction, the defendant received an additional 3-year sentence. § 11370.2. Thus, with three priors and the possibility of worktime reductions, see Cal. Penal Code Ann. § 2933 (West Supp. 1996), Hampton could have served as little as six years under California law. Since the time of the offenses, California has raised several of these penalties, but the new punishments could not be applied to respondents.

represented only 4% of the federal offenders convicted of trafficking in crack. Eighty-eight percent of such defendants were black. *Id.*, at 39, 161. During the first 18 months of full guideline implementation, the sentencing disparity between black and white defendants grew from preguideline levels: Blacks on average received sentences over 40% longer than whites. See Bureau of Justice Statistics, Sentencing in the Federal Courts: Does Race Matter? 6–7 (Dec. 1993). Those figures represent a major threat to the integrity of federal sentencing reform, whose main purpose was the elimination of disparity (especially racial) in sentencing. The Sentencing Commission acknowledges that the heightened crack penalties are a "primary cause of the growing disparity between sentences for Black and White federal defendants." Special Report 163.

The extraordinary severity of the imposed penalties and the troubling racial patterns of enforcement give rise to a special concern about the fairness of charging practices for crack offenses. Evidence tending to prove that black defendants charged with distribution of crack in the Central District of California are prosecuted in federal court, whereas members of other races charged with similar offenses are prosecuted in state court, warrants close scrutiny by the federal judges in that district. In my view, the District Judge, who has sat on both the federal and the state benches in Los Angeles, acted well within her discretion to call for the development of facts that would demonstrate what standards, if any, governed the choice of forum where similarly situated offenders are prosecuted.

Respondents submitted a study showing that of all cases involving crack offenses that were closed by the Federal Public Defender's Office in 1991, 24 out of 24 involved black defendants. To supplement this evidence, they submitted affidavits from two of the attorneys in the defense team. The first reported a statement from an intake coordinator at a local drug treatment center that, in his experience, an

equal number of crack users and dealers were caucasian as belonged to minorities. App. 138. The second was from David R. Reed, counsel for respondent Armstrong. Reed was both an active court-appointed attorney in the Central District of California and one of the directors of the leading association of criminal defense lawyers who practice before the Los Angeles County courts. Reed stated that he did not recall "ever handling a [crack] cocaine case involving non-black defendants" in federal court, nor had he even heard of one. *Id.*, at 140. He further stated that "[t]here are many crack cocaine sales cases prosecuted in state court that *do* involve racial groups other than blacks." *Id.*, at 141 (emphasis in original).

The majority discounts the probative value of the affidavits, claiming that they recounted "hearsay" and reported "personal conclusions based on anecdotal evidence." *Ante*, at 470. But the Reed affidavit plainly contained more than mere hearsay; Reed offered information based on his own extensive experience in both federal and state courts. Given the breadth of his background, he was well qualified to compare the practices of federal and state prosecutors. In any event, the Government never objected to the admission of either affidavit on hearsay or any other grounds. See 48 F. 3d, at 1518, n. 8. It was certainly within the District Court's discretion to credit the affidavits of two members of the bar of that Court, at least one of whom had presumably acquired a reputation by his frequent appearances there, and both of whose statements were made on pains of perjury.

The criticism that the affidavits were based on "anecdotal evidence" is also unpersuasive. I thought it was agreed that defendants do not need to prepare sophisticated statistical studies in order to receive mere discovery in cases like this one. Certainly evidence based on a drug counselor's personal observations or on an attorney's practice in two sets of courts, state and federal, can " 'ten[d] to show the existence' " of a selective prosecution. *Ante*, at 468.

Even if respondents failed to carry their burden of showing that there were individuals who were not black but who could have been prosecuted in federal court for the same offenses, it does not follow that the District Court abused its discretion in ordering discovery. There can be no doubt that such individuals exist, and indeed the Government has never denied the same. In those circumstances, I fail to see why the District Court was unable to take judicial notice of this obvious fact and demand information from the Government's files to support or refute respondents' evidence. The presumption that some whites are prosecuted in state court is not "contradicted" by the statistics the majority cites, which show only that high percentages of blacks are *convicted* of certain federal crimes, while high percentages of whites are convicted of other federal crimes. See *ante*, at 469–470. Those figures are entirely consistent with the allegation of selective prosecution. The relevant comparison, rather, would be with the percentages of blacks and whites who *commit* those crimes. But, as discussed above, in the case of crack far greater numbers of whites are believed guilty of using the substance. The District Court, therefore, was entitled to find the evidence before it significant and to require some explanation from the Government.[6]

---

[6] Also telling was the Government's response to respondents' evidentiary showing. It submitted a list of more than 3,500 defendants who had been charged with federal narcotics violations over the previous three years. It also offered the names of 11 nonblack defendants whom it had prosecuted for crack offenses. All 11, however, were members of other racial or ethnic minorities. See 48 F. 3d 1508, 1511 (CA9 1995). The District Court was authorized to draw adverse inferences from the Government's inability to produce a single example of a white defendant, especially when the very purpose of its exercise was to allay the court's concerns about the evidence of racially selective prosecutions. As another court has said: "Statistics are not, of course, the whole answer, but nothing is as emphatic as zero . . . ." *United States* v. *Hinds County School Bd.*, 417 F. 2d 852, 858 (CA5 1969) *(per curiam)*.

In sum, I agree with the Sentencing Commission that "[w]hile the exercise of discretion by prosecutors and investigators has an impact on sentences in almost all cases to some extent, because of the 100-to-1 quantity ratio and federal mandatory minimum penalties,. discretionary decisions in cocaine cases often have dramatic effects." Special Report 138.[7] The severity of the penalty heightens both the danger of arbitrary enforcement and the need for careful scrutiny of any colorable claim of discriminatory enforcement. Cf. *McCleskey* v. *Kemp*, 481 U. S. 279, 366 (1987) (STEVENS, J., dissenting). In this case, the evidence was sufficiently disturbing to persuade the District Judge to order discovery that might help explain the conspicuous racial pattern of cases before her court. I cannot accept the majority's conclusion that the District Judge either exceeded her power or abused her discretion when she did so. I therefore respectfully dissent.

---

[7] For this and other reasons, the Sentencing Commission in its Special Report to Congress "strongly recommend[ed] against a 100-to-1 quantity ratio." Special Report 198. The Commission shortly thereafter, by a 4-to-3 vote, amended the Guidelines so as to equalize the treatment of crack and other forms of cocaine, and proposed modification of the statutory mandatory minimum penalties for crack offenses. See Statement of Commission Majority in Support of Recommended Changes in Cocaine and Federal Sentencing Policy (May 1, 1995). In October 1995, Congress overrode the Sentencing Commission's Guideline amendments. See Pub. L. 104–38, 109 Stat. 334. Nevertheless, Congress at the same time directed the Commission to submit recommendations regarding changes to the statutory and guideline penalties for cocaine distribution, including specifically "revision of the drug quantity ratio of crack cocaine to powder cocaine." § 2(a).