**UNITED STATES of America**

v.

**Kristen GILBERT, Defendant.**

**No. Crim. 98–30044–MAP.**

United States District Court,
D. Massachusetts.

Dec. 2, 1999.

Ariane D. Vuono, William M. Welch, U.S. Atty's, U.S. Atty's Office, Springfield, MA, for United States.

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, Harry L. Miles, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, for Kristen Gilbert, defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR DISCOVERY OF INFORMATION DISCLOSING IMPERMISSIBLE CONSIDERATION OF RACE IN THE DECISION BY THE DEPARTMENT OF JUSTICE IN AUTHORIZING THIS CASE FOR THE DEATH PENALTY (Docket No. 144)*

NEIMAN, United States Magistrate Judge.

On May 13, 1999, a federal grand jury returned a seventeen count superseding indictment against Kristen Gilbert ("Defendant"). Defendant is charged, among other offenses, with four counts of first degree murder. The Government has filed a notice of intent to seek the death penalty on the four murder counts.

Presently before the court is Defendant's motion to compel the Government to produce certain national and statistical information which she contends is relevant to her claim that race may have played an impermissible role in the Government's decision to seek the death penalty. In response, the Government argues that the motion should be denied because Defendant has failed to make a necessary threshold showing that race (or, for that matter, gender) influenced its decision to seek the death penalty. Alternatively, the Government claims that the information sought by Defendant is protected from disclosure under an executive privilege and the attorney work-product doctrine. For the reasons which follow, the court will deny Defendant's motion.

## DISCUSSION

In her motion, Defendant seeks the following:

a. a chronological list of all cases, including the race of the defendant and the victim(s) and the gender of the defendant, occurring since 1994, known to the Department of Justice, wherein it is alleged that an individ-

ual committed a Federal crime which made him or her eligible for the death penalty, indicating whether the case was or was not authorized for the death penalty;

b. a chronological list of all cases, including the race of the defendant and the victim(s) and the gender of the defendant, occurring since 1994, known to the Department of Justice, where the defendant was alleged to be responsible for four or more murders and whether the death penalty was or was not authorized;

c. a chronological list of all cases, including the race and gender of the defendant, occurring since 1994 where the defendant was alleged to have murdered "vulnerable victims," and whether the death penalty was or was not authorized; [and]

d. a statement as to whether in each case identified above, the local United States Attorney did or did not request that the death penalty be authorized.

In support of this wide ranging request, Defendant alleges that racial discrimination may have played a part in the Government's decision to seek the death penalty because Defendant is a white female.

As Defendant concedes, the United States Supreme Court has held that a criminal defendant may be entitled to discovery to help prove a claim of selective prosecution if she makes "a credible showing of different treatment of similarly situated persons." *United States v. Armstrong*, 517 U.S. 456, 470, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). *See also Willhauck v. Halpin*, 953 F.2d 689 711–12 (1st Cir.1991). This same principle, Defendant argues, should apply here where statistics seem to reflect an unequal application of the death authorization process based upon racial and gender considerations. *See United States v. Roman*, 931 F.Supp.

960, 965 (D.R.I.1996) (examining similar discovery request "through the lens of *Armstrong* ").

A.

Defendant's claim that further discovery is warranted is based upon two sources of information, each of which demonstrates what Defendant calls "reverse discrimination." First, Defendant refers to data provided by the Death Penalty Resource Counsel which indicates that, prior to 1996, the Department of Justice had approved seventy-nine defendants for sentences of death. Of those defendants, 77.7% were members of a racial minority. However, later statistics reveal what Defendant claims to be a dramatic change in the racial makeup of death penalty authorizations, after the Department of Justice was publicly criticized for the stark racial patterns of its approvals. From mid–1996 to mid–1998, Defendant asserts, eleven of the twenty-three capital cases authorized were against white individuals. "This disturbing pattern continues," Defendant contends, and demonstrates "that she was selected for the death penalty at least in part because she was white and because she is female." (Def.'s Mem. (Docket No. 145) at 3.) [1]

Second, Defendant produces certain documents provided by the Department of Justice in two death penalty cases, one a 1998 case out of the Southern District of New York, *United States v. Heatley*, and another more recent case in Vermont, *United States v. Dean*. Interestingly enough, the *Heatley* and *Dean* documents include some of the very information sought here by Defendant.

The Department of Justice information provided in *Heatley* shows that between January 27, 1995 and August 10, 1998, 296 capital-eligible cases were reviewed involving 239 non-white and 57 white individuals.

---

1. Defendant acknowledges that, currently, 70.0% of death penalty prosecutions authorized by the Department of Justice involve racial minorities, a number which, Defendant asserts, "is surely a source of embarrassment to the Attorney General." (Def.'s Mem. (Docket No. 145) at 4.) *See also* RANDALL KENNEDY, RACE, CRIME AND THE LAW 311–350 (1997).

Of the 57 white individuals, the Department of Justice approved 23 (40.4%) for the death penalty, while of the non-white individuals, 55 (or "only" 23.0%) were approved. The updated statistics provided by the Department of Justice in *Dean* indicate that, in the ten month period following *Heatley*, 14 of 29 (48.3%) white defendants who were reviewed by the Department of Justice were authorized for the death penalty, while 32 of the 98 non-white individuals (32.7%) were authorized.

### B.

This court recently had occasion to address *Armstrong* in a somewhat different context, the discovery of prosecutorial data in relation to crack cocaine prosecutions in this division of the federal district. *See United States v. Tuitt*, 68 F.Supp.2d 4 (D.Mass. 1999). As therein explained, the Supreme Court in *Armstrong* set a "rigorous" standard for defendants to be provided such discovery:

[T]he Supreme Court first reviewed the "demanding" standard applicable to the underlying selective prosecution claim. [*Armstrong*, 517 U.S.] at 463, 116 S.Ct. 1480. Such a claim, the Court explained, "is not a defense on the merits of the criminal charge itself, but an independent assertion that the prosecution brought the charge for reasons forbidden by the Constitution." *Id.* Accordingly, the Court reasoned, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463–64, 116 S.Ct. 1480. The Court did not want "to unnecessarily impair the performance of a core executive constitutional function." *Id.* at 464–65, 116 S.Ct. 1480. Quoting *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), the Court explained that "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecution's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465, 116 S.Ct. 1480.

*Tuitt*, at 7–8. As this court further pointed out, *Armstrong* "held that a defendant can obtain discovery only by making 'a credible showing of different treatment of similarly situated persons.'" *Tuitt*, at 8 (quoting *Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480). This "rigorous standard," *Armstrong* concluded, "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.*, 517 U.S. at 470, 116 S.Ct. 1480.

There is not doubt that *Armstrong* created a heavy burden upon a defendant seeking discovery related to a possible claim of selective prosecution. Indeed, the Supreme Court's approach "has convinced many commentators that the decision renders many meritorious claims of selective prosecution impossible to prove." *Tuitt*, at 8–9 (citations omitted). *See also* Marc Michael, *United States v. Armstrong: Selective Prosecution—A Futile Defense and Its Arduous Standard of Discovery*, 47 Catholic Univ.L.Rev. 675 (1998). Still, while the hurdle may be high, it is not, to use the words of Chief Justice Rehnquist in *Armstrong*, "insuperable." *Id.*, 517 U.S. at 470, 116 S.Ct. 1480. Indeed, this court ordered further discovery in *Tuitt*, the defendant there having scoured federal and state records and having produced significant information in support of his claim.

Despite Defendant's apparent concession that selective prosecution standards established in *Armstrong* apply here with respect to the Government's decision to seek the death penalty, at least one commentator has argued that *Armstrong*'s application to federal capital cases is not only "legally unsound," but "fundamentally unjust." Stefanie Lindeman, *Because Death Is Different: Legal and Moral Arguments For Broadening Defendants' Rights To Discovery in Federal Capital Cases*, 73 St. John's L.Rev. 541, 556 (1999). Unlike the

exercise of discretion in prosecuting a defendant in a non-capital case, the underlying issue in *Armstrong,* the commentator notes that "the prosecutor in a capital case has little discretion in determining whether to seek the death penalty. The authorization process is strictly governed by the United States Attorney's Manual and the prosecutor cannot file a notice of intent without the permission of the Attorney General." *Id.* (footnote omitted).

### C.

Even were the court inclined to somehow lower the *Armstrong* standard in the circumstances presented here, Defendant has failed to show that the decision of the Attorney General to seek the death penalty was improperly tainted by either a discriminatory effect or discriminatory intent, at least sufficiently so as to cause the court to order discovery. Of course, if the Government is aware that race was considered in any way in its decision to seek the death penalty, that information, in the court's opinion, would have to be divulged pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

First, Defendant has not shown, let alone attempted to show, that the Attorney General has failed to authorize the death penalty for similarly situated non-white defendants. Granted, as Defendant herself acknowledges, the nature of the offenses alleged against her are unique; there are admittedly no other nurses accused of poisoning patients in the course of their work in the federal system. For that reason, it appears, Defendant seeks data about other federal defendants who are alleged to have murdered "vulnerable victims," a term left undefined.

Still, despite Defendant's access to information about other federal cases, including the race and gender of those defendants, she herself has not proffered an example of a case which even approaches the allegations present here. The most Defendant offers in this regard is to note that the State of Indiana did not seek the death penalty against Orville Lynn Majors, a former nurse who was recently convicted of murdering six patients. As the Government asserts, however, the decision of a state prosecutor has little if any bearing on this federal capital case. Further, Defendant's attempt to challenge the Government to cite an instance in which the death penalty was authorized in similar circumstances is an improper attempt to switch the burden of production.

Second, Defendant has failed to provide enough evidence that the death penalty decision may have been motivated by a discriminatory purpose. To be sure, the statistics appear to show a disturbing concentration on non-white defendants and a higher percentage of white defendants for whom the death penalty is now sought. Nowhere, however, does Defendant attempt to demonstrate that the numbers are statistically significant. *See United States v. Holloway,* 29 F.Supp.2d 435, 441 (M.D.Tenn.1998). Moreover, Defendant has not come forward with "evidence specific to [her] own case that racial consideration played a part" in the charging decision. *McCleskey v. Kemp,* 481 U.S. 279, 292–93, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). *See also United States v. Saade,* 652 F.2d 1126, 1135 (1st Cir.1981) (recognizing threshold presumption that a prosecutor has acted in "good faith for reasons of sound governmental policy" in implementing decision to prosecute).

This paucity of evidence stands in contrast to the Death Penalty Protocol avowedly followed by the Attorney General in this matter. Effective January 27, 1995, the Government reports, the Department of Justice established internal administrative procedures for implementing the federal death penalty statutes. This protocol is published at Section 10 of Title 9 of the United States Attorneys' Manual ("U.S.A.M."). *See generally Roman,* 931 F.Supp. at 963–64. The apparent purpose of the protocol was "to avoid the issue of race and insure consistency in the death authorization process." *Holloway,* 29 F.Supp.2d at 437.

Although "the protocol does not create substantive or procedural rights," *id.* at 964, it requires the Attorney General to review "all Federal cases in which a defendant is charged with an offense subject to the death penalty, regardless of whether the United States Attorney intends to request authorization to seek the death penalty." 9 U.S.A.M. § 9–10.010. The Attorney General makes the final decision whether the death penalty shall be sought in any particular case. A defendant, as was the case here, is given the opportunity to present the reasons why the death penalty should not be sought. 9 U.S.A.M. § 9–10.000D.

The protocol also requires the United States to submit a prosecution memorandum containing a comprehensive outline of the case and a "death penalty evaluation form," 9 U.S.A.M. § 9–10.040, which submissions may not contain any reference to the race of the defendant. Consistent with this purpose, the Government asserts that the prosecution memorandum and death penalty evaluation form submitted by the United States Attorney to the Attorney General here contained no reference to Defendant's race. Moreover, pursuant to current practice, the United States Attorney prepared and submitted, under seal, a separate form denominated "non-decisional information." While this form contains identifying racial information about Defendant and the alleged victims in this matter, it was not made available to anyone at the Department of Justice, including the Attorney General, who was involved in the process which culminated in the final decision to seek the death penalty.

The statistical information provided by Defendant is simply insufficient to raise a sufficient inference of discriminatory intent as to call for further discovery. Aside from the fact that the data relied upon is not specific to her case, Defendant's motion fails to support an inference that a decision to prosecute her was discriminatorily based. *See McCleskey,* 481 U.S. at 292–93, 107 S.Ct. 1756 (holding that statistical evidence of racial disparity is insufficient *per se* to infer an "unacceptable risk"

of racial discrimination in the administration of capital punishment); *Armstrong,* 517 U.S. at 466, 116 S.Ct. 1480 (rejecting the statistical information provided therein); *Holloway,* 29 F.Supp.2d at 442 ("general statistics, without more, are insufficient to satisfy the discriminatory intent element"); *compare Tuitt* (discussed *supra*). Numerous federal courts have considered similar claims of discrimination and have found them wanting. *See Holloway,* 29 F.Supp.2d at 437–43; *United States v. Frank,* 8 F.Supp.2d 253, 283–84 (S.D.N.Y.1998); *United States v. McVeigh,* 944 F.Supp. 1478, 1483–84 (D.Col.1996); *United States v. Nguyen,* 928 F.Supp. 1525, 1544–45 (D.Kan.1996); *Roman,* 931 F.Supp. at 964–67; *United States v. DesAnges,* 921 F.Supp. 349, 357–58 (W.D.Va. 1996); *United States v. Walker,* 910 F.Supp. 837, 857–60 (N.D.N.Y.1995); *United States v. Davis,* 904 F.Supp. 554, 559 (E.D.La.1995).

## CONCLUSION

It is unnecessary to address the Government's alternative arguments because, for the reasons stated, Defendant has failed to convince the court that she is entitled to the discovery she seeks. Of course, Defendant is not precluded from maintaining her stand that improper selective prosecutorial decisions were at play in this matter or from pursuing substantive motions related to that claim based on the information already in her possession. Indeed, in this regard, Defendant has the information sought in the first paragraph of her motion in the form of updated data from the *Dean* case. At this time, however, the court is simply declining Defendant's request for broader discovery. Accordingly, Defendant's motion is DENIED.

IT IS SO ORDERED.