**UNITED STATES of America**

v.

**Chad Ramon JONES, Defendant.**

**Criminal No. 3:98cr221.**

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 26, 1999.

David Preston Baugh, Richmond, VA, for Defendant.

Stephen David Schiller, U.S. Attorney's Office, Richmond, VA, for U.S.

Before RICHARD L. WILLIAMS, Senior District Judge, and JAMES R. SPENCER and ROBERT E. PAYNE, District Judges.

### MEMORANDUM OPINION

PER CURIAM.

This matter is before the Court on defendant's motion to dismiss the indictment. Defendant argues that his prosecution in federal, rather than state, court is an unconstitutional attempt to avoid a jury pool consisting of greater numbers of African–Americans. For the reasons stated below, the Court is compelled to DENY the motion.

### I. FACTS

The defendant, Chad Ramon Jones ("Jones"), is an African–American. On May 31, 1998, he was operating his motor vehicle in the City of Richmond. He had two passengers in his vehicle. A Richmond Deputy Sheriff observed defendant proceed in the wrong direction on a one-way street. The police officer stopped defendant's vehicle and

determined that defendant's driver's license was suspended. During a search of the vehicle subsequent to the stop, the police officer discovered marijuana, a nine-millimeter pistol, and drug paraphernalia.[1]

The defendant was initially charged with violating statutes of the Commonwealth of Virginia ("Virginia" or the "Commonwealth") and was slated for prosecution in state court. However, a program designated "Project Exile" resulted in the transfer of Jones' case for prosecution in this Court. On July 8, 1998, a federal grand jury issued a four-count indictment against Jones.[2] The federal indictment covered precisely the same conduct originally prosecuted in the state proceedings. On August 4, 1998, a United States Magistrate Judge released Jones pending trial.

Project Exile is a project jointly undertaken by the Commonwealth's Attorney for the City of Richmond and the United States Attorney for the Eastern District of Virginia. It was conceived in November 1996 and implemented in the City of Richmond in February 1997. The Program was later expanded to the City of Norfolk. Both cities suffer from high rates of violent crime. While Richmond possesses only three percent of the Commonwealth's population, it accounts for twenty-seven percent of its homicides.

The stated goal of Project Exile is to reduce violent crime by federally prosecuting firearm-related crimes whenever possible. Under Project Exile, local police review each firearm-related offense to determine whether the conduct alleged also constitutes a federal crime. *See, e.g.,* 18 U.S.C. §§ 922(g) and 924(g) (prohibiting the possession of firearms by certain persons).[3] In those cases in which the conduct alleged also constitutes a federal crime, local police refer the matter to the

United States Attorney for the Eastern District of Virginia. If the United States Attorney obtains an indictment charging the defendant with federal firearm-related crimes, then the Commonwealth's Attorney drops the state charges, and the case proceeds in federal court.

Project Exile has resulted in the prosecution of several hundred defendants in federal court. To assist federal prosecutors with this additional workload, one Assistant Commonwealth's Attorney (of the thirty assigned to the office of the Commonwealth's Attorney for the City of Richmond) and one prosecutor from the Office of the Attorney General are assigned as a Special Assistant United States Attorneys ("Special AUSAs"). No additional resources are provided the federal judiciary, prosecutors, or law enforcement. Project Exile is widely publicized on television, radio, billboards, and buses. A professional advertising agency is responsible for this publicity. The advertising agency is paid with private funds donated by the "Project Exile Citizen Support Foundation."

The parties were unable to provide the Court precise empirical data concerning either the race of Project Exile defendants or the racial composition of the relevant jury pools. However, the parties agree to these general facts. Both Norfolk and Richmond have significant African–American populations. The vast majority, and perhaps as many as ninety percent of the defendants prosecuted under Project Exile are African–American. The jury pool for the Circuit Court for the City of Richmond is approximately seventy-five percent African–American. The jury pool for the Richmond Division of the Eastern District of Virginia is drawn from a broader geographic area. In

---

1. The specific facts regarding the search and seizure of the weapon and narcotics are not apparent from the record at this incipient stage of the proceedings. Nor are those facts relevant to the motion currently before the Court.

2. Count I charged defendant with possession with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841. Count II charged defendant with possession of a controlled substance in violation of 21 U.S.C. § 844. Count III charged defendant with carrying a firearm during and in relation to a drug traffick-

ing offense in violation of 18 U.S.C. § 924(c). Count IV of the indictment seeks forfeiture of the drug-related property, firearm, and ammunition.

3. Local police officers are provided classroom instruction and laminated wallet-sized cards detailing the relevant federal statutes to assist in determining whether the alleged conduct constitutes a federal crime. Local police officers also enjoy pager access to a federal agent of the Bureau of Alcohol, Tobacco, and Firearms with whom they may consult at any time.

contrast to the state jury pool, it is only about ten percent African–American. At a local Bench–Bar Conference discussing the issue, an Assistant United States Attorney ("AUSA") stated that one goal of Project Exile is to avoid "Richmond juries." The same admission was made by the AUSA prosecuting *United States v. Scates,* 3:98cr87, sentencing transcript at 36–37 (E.D.Va. Nov. 24, 1998).

In addition to the racial differences between the relevant jury pools, there are several other relevant comparisons between prosecutions in the state and federal courts. The federal and state statutes prohibiting possession of firearms are not markedly different. *Compare* 18 U.S.C. § 922(g) *with* Va.Code Ann. §§ 18.2–308.1:1 through 18.2–308.2:1 and 18.2–308.4. Both federal and state statutes proscribe possession of firearms by felons. *See* 18 U.S.C. § 922(g)(10) and Va. Code Ann. § 18.2–308.2. Both prohibit persons from possessing firearms during the commission of drug trafficking offenses. *Compare* 18 U.S.C. § 924(g) *with* Va.Code Ann. § 18.2–308.4.

The state has no statute that prohibits possession of a firearm by a person who is an "unlawful user of or addicted to any controlled substance." *See* 18 U.S.C. 922(g)(3). However, the state targets the same general conduct by prohibiting a person who was twice convicted within the previous thirty-six months of a drug-related misdemeanor from possessing a firearm. *See* Va.Code Ann. § 18.2–308.1:5. The state does not prohibit the possession of a firearm by a person previously convicted of domestic abuse. *See* 18 U.S.C. § 922(g)(9). Again however, the state has an analogous statute prohibiting possession by one currently subject to a protective order. *See* Va.Code Ann. § 18.2–308.1:4. In the Court's experience, nearly all Project Exile defendants are prosecuted under one of the four federal statutes cited above.

In some minor regards, the federal statute proscribing possession by prohibited persons is more exhaustive than its state counterpart. The federal statute also prohibits other persons who are rarely, if ever, prosecuted un-

der Project Exile from possessing firearms. *See, e.g.,* 18 U.S.C. § 922(g)(2) (prohibiting possession by fugitives); 18 U.S.C. § 922(g)(6) (prohibiting possession by persons discharged from the Armed Forces under dishonorable conditions); 18 U.S.C. § 922(g)(7) (prohibiting possession by persons who have renounced their citizenship).

■ In addition to the minor statutory differences cited above, the federal and state systems are governed by different sentencing provisions. In criminal cases, a state jury recommends a sentence. While the Circuit Court Judge is not bound by that recommendation, the recommendation imposes a ceiling, above which the judge may not sentence the defendant. Both the federal and state systems now have sentencing guidelines. The federal guidelines are mandatory. *See* 18 U.S.C. § 3553(b). The state guidelines are discretionary. *Hudson v. Commonwealth,* 10 Va.App. 158, 160–61, 390 S.E.2d 509, 510 (1990); *see also Fortune v. Commonwealth,* 12 Va.App. 643, 651, 406 S.E.2d 47, 51 (1991). Both have abolished parole. *See* 18 U.S.C. § 3621; Va.Code Ann. § 53.1–165.1.

The basic statutes at issue impose different maximum penalties. The federal statute imposes a maximum penalty of ten years for most violations of Title 18, United States Code, Section 922(g). *See* 18 U.S.C. § 924(a)(2). This statutory maximum penalty is rarely imposed, however. The sentencing guidelines impose a base offense level of fourteen for possession of a firearm by a prohibited person. *See* U.S.S.G. § 2k2.1(a)(6). The sentencing guidelines call for a range of imprisonment varying from fifteen to forty-six months for this base offense level, depending upon a defendant's criminal history. *See* U.S.S.G., ch. 5, pt. A. The state statutes prohibiting possession of firearm by a felon or by a person in possession of controlled substances impose a sentence of one to five years. *See* Va.Code Ann. § 18.2–308.2., 18.2–308.4, and 18.2–10.[4] Each system has separate provisions to enhance the sentences of recidivists. The federal guidelines include an

---

**4.** Correspondence received from several state judges demonstrates that those judges would sen-

tence in accord with statutory maximum were they given the opportunity.

"Armed Career Criminal" provision. *See* U.S.S.G. § 4B1.4. Va.Code Ann. § 53.1–151 B1 represents the state's analogous "three strikes and you're out" provision.[5]

At the inception of Project Exile, the United States Attorney, the Commonwealth's Attorney and the Chief of Police asserted that federal prosecution was necessary because state court judges were ulikely to impose sentences sufficiently severe to serve as sufficient punishment for, or adequate deterrence of, narcotics related firearm offenses. *See United States v. Nathan,* No. 3:98cr116, Mem. Op. at 23–25, (E.D.Va., July 23, 1998). However, that assertion was disproved by the empirical data for prosecution of cases involving narcotics and firearms offenses for 1993 through 1995 (the last period preceding the inception of Project Exile for which statistics are available). *Id.* In particular, the data showed that few firearms offenses ever reached the state judiciary for sentencing. And, the same statistics suggested strongly that the paucity of firearms convictions was attributable to the failure to arrest or prosecute such offenses or to the disposition of those offenses by plea bargain. *Id.*

In addition to the different statutes and punishments in the federal and state systems, proponents of Project Exile maintain that pre-trial release from custody is routine during state prosecutions and rare during federal prosecutions. However, both systems proscribe release of a defendant who poses either a substantial risk of failing to appear or an unreasonable danger to himself or others. *Compare* 18 U.S.C. § 3142(e) (noting a "rebuttable presumption" against bond if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other

person and the community"); *with* Va.Code Ann. § 19.2–120 (noting that a defendant shall be released on bond "unless there is probable cause to believe that: 1. He will not appear for trial or hearing or at such other time and place as may be directed, or 2. His liberty will constitute an unreasonable danger to himself or the public"). Testimony indicates that the Commonwealth rarely, if ever, opposes pre-trial release at the initial appearance of a defendant in state prosecutions. In fact, the Commonwealth's Attorney for the City of Richmond indicated that he had never sent a prosecutor to the magistrate to oppose pre-trial release of a defendant. As previously noted, defendant Jones was released on bond during his prosecution in federal Court.

Proponents of Project Exile also maintain that defendants convicted in the federal system are subject to incarceration in remote federal institutions far removed from Virginia. Testimony indicates however, that the Federal Bureau of Prisons selects the location of a convicted defendant's incarceration for reasons independent of those advanced by Project Exile proponents. The vast majority of Project Exile defendants are incarcerated at the Northern Neck Regional Jail[6] while awaiting trial and at the Federal Corrections Institute in Petersburg, Virginia following conviction. The Commonwealth of Virginia possesses numerous facilities more geographically removed from the City of Richmond than is the federal facility in Petersburg.

## II.  LEGAL ANALYSIS

Jones maintains that Project Exile violates his right to equal protection. A defendant's right to equal protection during

---

5.  The state statute abolishes parole for any person convicted of three separate felony offenses of i) murder, ii) rape or iii) robbery by the presenting of firearms or other deadly weapons. *See* Va.Code Ann. § 53.1–151 B1. Drug offenses do not independently qualify as one of the three "strikes," thus distinguishing the state's "three strikes" provision from the federal "Armed Career Criminal" provision.

6.  The Northern Neck Regional Jail is a state facility.  Its role in Project Exile further illustrates the financial inequities imposed by the

program.  The Federal Bureau of Prisons leases space in the Northern Neck Regional Jail from the Commonwealth of Virginia to incarcerate Project Exile defendants prior to trial. Thus the Commonwealth's prisons benefit not only from a lower occupancy rate once defendants are convicted under Project Exile and are incarcerated in a federal facility, but also by generating revenue for housing defendants while they await trial in the federal system.  This is another cost borne by federal taxpayers, the benefit of which inures exclusively to residents of the Commonwealth.

federal prosecution is secured by the Due Process Clause of the Fifth Amendment. *See United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *United States v. Lane*, 866 F.2d 103, 104 n. 1 (4th Cir.1989). Under the equal protection component of the Fifth Amendment's Due Process Clause, prosecutorial decisions may not be based on an arbitrary classification such as race. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). The Court is able to discern several distinct grounds on which Project Exile could violate Jones' guarantee of equal protection. Each is detailed below.

### A. THE RACIAL COMPOSITION OF THE JURY

▆ The defendant argues that Project Exile represents an effort by prosecutors to avoid Richmond juries that are drawn from a population with a greater proportion of African–Americans than are federal juries in the Eastern District of Virginia.[7] There is no dispute that the conduct with which defendant Jones is charged would, if proven, constitute both a state and federal crime. Accordingly, the tribunal in which prosecution occurs depends upon the exercise of prosecutorial discretion. United States Attorneys retain " 'broad discretion' " to enforce the nation's criminal laws. *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n. 11, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926).

▆ However, the substantial latitude our nation affords prosecuting attorneys is undoubtedly accompanied by the potential for abuse. Accordingly, the Constitution im-poses limits upon the exercise of prosecutorial discretion. *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). A long line of cases from the United States Supreme Court holds that the guarantee of equal protection reaches prosecutorial decisions that affect the racial composition of juries. A "person's race simply 'is unrelated to his fitness as a juror.' " *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting)). Accordingly, a defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85–86, 106 S.Ct. 1712. Allowing a defendant to challenge discriminatory jury selection procedures protects not only the defendant's right to equal protection, but also vindicates the interests of excluded jurors and the community at large. *Powers v. Ohio*, 499 U.S. 400, 406, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

▆ Cases prosecuted under Project Exile, and defendant Jones' case in particular, could be prosecuted in either the state or the federal system. Several cases from other jurisdictions have analyzed analogous situations in which the location of a prosecution produces dramatic variations in the racial composition of the jury pool. *See, e.g., U.S. v. Cannon*, 88 F.3d 1495 (8th Cir.1996) (denying claim alleging that federal law enforcement officials lured African–American defendants into committing crime across state line to establish venue in a district with significantly fewer African–Americans). This issue often arises during transfers of venue in criminal cases. Courts transferring venue

---

7. The defendant does not contend that the jury pool in the Eastern District of Virginia violates any aspect of the Jury Selection and Service Act. *See* 28 U.S.C. §§ 1861–1878. The Jury Selection and Service Act provides a statutory remedy to ensure that all litigants in federal courts entitled to trial by jury have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division in which the court convenes. *See* 28 U.S.C. § 1861: *see also Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

are not constitutionally required to ensure that the racial composition of the receiving jurisdiction mirrors that of the transferring jurisdiction. *See, e.g., Simon v. State,* 633 So.2d 407 (Miss.1993), *vacated on other grounds,* 513 U.S. 956, 115 S.Ct. 413, 130 L.Ed.2d 329 (1994).[8] Indeed, on at least one occasion, the United States Supreme Court declined to review an equal protection claim asserted by an African–American defendant whose prosecution was transferred from a jurisdiction in which more than 1,100 African–Americans resided to one in which none lived. *Mallett v. Missouri,* 769 S.W.2d 77 (Mo.1989), *cert. denied* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990).

In each of the cases cited above, the court uniformly held that the relative paucity of minority jurors in the jurisdictions or venues in which the prosecutions occurred was immaterial. As these cases make plain, a defendant has no right to a jury of any particular racial composition so long as that jury is fairly selected from the jurisdiction it serves. In sum, "[p]rejudice to the defendant is caused not by where the jury is selected, but instead by how the jury is selected." *De La Beckwith v. State,* 707 So.2d 547 (Miss.1997).

The defendant proffers no evidence to suggest that the selection of the federal juries serving the Eastern District of Virginia is, in any manner, constitutionally infirm. Accordingly, the relative paucity of African–Americans in this pool does not implicate defendant's right of equal protection guaranteed by the Due Process Clause of the Fifth Amendment.

## B. SELECTIVE PROSECUTION

The equal protection component of the Fifth Amendment's Due Process Clause also prohibits the selective federal prosecution based upon race. A prima facie case of selective prosecution contains two distinct elements. First, the defendant must establish that similarly situated individuals of a different race were not prosecuted. *Ah*

*Sin v. Wittman,* 198 U.S. 500, 25 S.Ct. 756, 49 L.Ed. 1142 (1905); *United States v. Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480. Second, he must establish that the differing treatment is "motivated by a discriminatory purpose," *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), or was "invidious or in bad faith." *United States v. Greenwood,* 796 F.2d 49, 52 (4th Cir.1986). The United States Supreme Court has repeatedly emphasized that a defendant's burden in establishing a prima facie case of selective prosecution is "a demanding one." *Armstrong,* 517 U.S. at 463, 116 S.Ct. 1480.

Project Exile would be vulnerable on selective prosecution grounds if African–American defendants were routinely diverted from state to federal prosecution while prosecutors allowed similarly situated Caucasian defendants to remain in state court. Both federal and state prosecutors deny that the decision to federally prosecute a Project Exile defendant is any way attributable to a defendant's race. However, the parties acknowledge that the vast majority, and perhaps as many as ninety percent, of Project Exile defendants are African–American. Although defendant suggests otherwise, he presents no evidence of Caucasian defendants similarly situated to defendant Jones evading diversion to federal court. A successful case of selective prosecution cannot be made absent a clear showing of racial animus and the defendant has not made a clear showing on that facet of his claim.

Despite the absence of direct evidence of selective prosecution, the Court takes this opportunity to express its concern about the discretion afforded individuals who divert cases from state to federal court for prosecution under Project Exile. Witnesses from the offices of both the Commonwealth's Attorney and the United States Attorney were unable to detail the specific process by which this review and diversion occur.[9] A local police officer is apparently individually re-

---

8. While not constitutionally required, considering the racial composition of the jury pool serving the transferee court is not constitutionally prohibited either. *Id.*

9. The inability of the prosecutors to explain the procedure clearly is disquieting and casts some doubt on the assertion that race places no role in deciding whether a particular case is to be federally prosecuted.

sponsible for this task. That officer reviews the records of potential Project Exile defendants to determine whether their cases are appropriate for federal prosecution. A defendant's race is evident from these records. While cases referred for federal prosecution are reviewed to ensure that the alleged conduct constitutes a federal crime, witnesses identified no means of reviewing the cases retained for state prosecution. Absent more comprehensive scrutiny, there exists no means to ensure that this substantial discretion is constitutionally exercised.

If the process of diverting cases for federal prosecution is indeed independently accomplished by one unsupervised individual who is aware of the defendants' race, then Project Exile unnecessarily invites a substantial risk of selective prosecution. Indeed, if, as proponents of Project Exile maintain, there are disparities in the effectiveness of federal and state prosecutions, then those disparities only increase the potential for discriminatory diversions for federal prosecution absent some form of review.

Despite this unnecessary potential for constitutional infirmities, the defendant has produced no specific evidence that a similarly situated defendant of another race has evaded federal prosecution under Project Exile. While the Court recognizes the inherent risk of constitutional violations engendered by the absence of any institutional review of Project Exile diversions to federal Court, it is compelled to rule on this record that defendant Jones has failed to demonstrate a prima facie case of selective prosecution.

### C. THE DISPARATE IMPACT OF PROJECT EXILE ON AFRICAN–AMERICAN DEFENDANTS

The equal protection component of the Fifth Amendment's Due Process clause prohibits the discriminatory prosecution of defendants based upon an arbitrary classification such as race. Prosecutors have implemented Project Exile in Richmond and Norfolk. Both areas are urban and the population of each is substantially African–American. In these areas, federal firearms statutes are aggressively enforced. The same statutes, however, are rarely enforced in more rural areas of the Eastern District of Virginia. This geographic variance means that defendants charged with firearms offenses in outlying areas of the Eastern District of Virginia, who are more likely to be Caucasian, evade federal prosecution under identical and equally applicable statutes for identical conduct. Additionally, the record is that approximately ninety percent of the Project Exile defendants are African–American. Accordingly, there is little doubt that Project Exile has a disparate impact on African–American defendants.

However, more than a disparate impact is required to substantiate an equal protection claim. To substantiate an equal protection claim, a disparate racial impact must be accompanied by evidence of racial animus or disparate treatment. See Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Thus, prosecutors may specifically target one activity for enforcement, even if that activity is primarily engaged in by members of one race, without necessarily violating the Constitution's guarantee of equal protection. See, e.g., United States v. Travis, 837 F.Supp. 1386, (E.D.Ky., 1993) (holding "that police investigations which have a disproportionate impact on minorities [do not] offend the Constitution unless the targeting is based solely on race"). And, given the presumption of regularity attending the exercise of prosecutorial discretion, the evidence of discriminatory intent must be clear.

Those who implemented Project Exile have targeted cities in which violent crime is most prevalent. The evidence does not show that those officials targeted defendants of a particular race. While confining Project Exile to Richmond and Norfolk imposes an undeniably disparate impact on African–American defendants, the equal protection component of the Fifth Amendment's Due Process Clause does not proscribe the exercise of non-discriminatory discretion. See Oyler, 368 U.S. at 456, 82 S.Ct. 501 ("the conscious exercise of some selectivity in enforcement is not itself a federal constitutional

violation [so long as] the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification").

Defendant argues that the AUSA's statements at the Bench–Bar Conference and in *United States v. Seates* that Project Exile was implemented to avoid "Richmond juries" constitutes such evidence of discriminatory intent. Evidence that the Commonwealth's Attorney and the United States Attorney desire to avoid Richmond juries in cases such as this is evidence which suggests discriminatory motivation in the initiation and pursuit of Project Exile especially when it is considered that ninety percent of the Project Exile defendants are African–American, seventy-five percent of the Richmond juries are of that race, and ten percent of the federal juries are of that race. However, the "desire to avoid Richmond juries" can be given a less nefarious construction. A "Richmond jury" could simply be one bound by the laws of the Commonwealth of Virginia. As the government argued in *United States v. Scates*, No. 3:98cr 87, sent. trans. at 37 (E.D.Va., Nov. 24, 1998), a "Richmond jury" could be one endowed, as juries in the Commonwealth are, with the ability to recommend a term of imprisonment above which a judge may not sentence a defendant. Considering that "[n]o latitude of intention should be indulged in a case like this." *Armstrong*, 517 U.S. at 466, 116 S.Ct. 1480 (quoting *Ah Sin*, 198 U.S. at 508, 25 S.Ct. 756), and taking into account the presumption of regularity afforded prosecutorial discretion, the Court is unwilling to ascribe an unconstitutional intent to those responsible for Project Exile absent clear evidence of a racially discriminatory intent.[10]

### III. OTHER FACETS OF DEFENDANT'S MOTION

The defendant's motion presents several other questions which warrant assessment.

### A. FEDERALISM

■ Project Exile raises serious questions respecting basic principles of federalism. The United States Constitution preserved for the states an "inviolable sovereignty." *Printz v. United States,* 521 U.S. 98, 117 S.Ct. 2365, 2376, 138 L.Ed.2d 914 (1997) (quoting *The Federalist No. 39,* at 245 (J. Madison)). Historically, there may be no state that has more vehemently defended its sovereignty than has Virginia. *See, e.g., Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816) (deciding the contentious debate between Chief Justice John Marshall and Justice Spencer Roane regarding the United States Supreme Court's appellate authority over Virginia's Supreme Court). This historical tendency is still apparent in some regards. *See, e .g.,* Matthew Bowers, *Virginia Is the Last Holdout for Federal Goals 2000 Money,* Virginian–Pilot & Ledger Star (Norfolk Va.), Nov. 24, 1996 at B3 (describing the Commonwealth's initial opposition to receiving millions of dollars in federal education funding to prevent federal incursion into a traditional province of the state). This history of resolute opposition to federal incursion into state matters makes the local authorities' acquiescence to Project Exile all the more puzzling.

The purpose of Project Exile is, beyond question, laudable. However, the problems it targets are undeniably local in both nature and effect. As a comparative examination of the state and federal systems will indicate, local law enforcement authorities suffer from no inherent incapacity to redress the problems Project Exile targets. However, instead of bringing the resources of the Commonwealth to bear, local authorities have abdicated their responsibility to the federal government. Citizens of Richmond, Norfolk, and the Commonwealth of Virginia have the right to expect more from their elected officials. An abdication of responsibility lowers citizens' expectations of the Commonwealth's

---

10. The rather remarkable notion that state prosecutors desire to avoid juries in the City of Richmond is a matter as to which citizens of Richmond might rightfully take offense, but without statistical and other evidentiary support, that admitted desire does not prove discriminatory intent.

public servants, it insulates those officials from constructive criticism, and it dissipates political pressure that citizens might otherwise exert to improve the performance of local law enforcement.

Not only does Project Exile threaten to diminish local law enforcement, it also requires that citizens of the forty-nine other states subsidize local law enforcement activities. One Assistant Commonwealth's Attorney and one prosecutor from the Office of the Attorney General are assigned as a Special AUSAs to assist with Project Exile prosecutions. Additionally, the marketing effort publicizing Project Exile is privately funded. However, excepting these relatively insignificant items, federal taxpayers pay for every Project Exile prosecution, every resulting incarceration, and for the vast majority of criminal defense attorneys defending these prosecutions.[11]

Not only does Project Exile force federal taxpayers to support local law enforcement, it does so at a significantly greater expense than would a comparable state prosecution. The rates that the federal government pays for court-appointed counsel and incarceration, for example, are both significantly more than that paid by the Commonwealth. The Commonwealth will pay no more than $305 to court-appointed counsel representing an indigent defendant accused of firearms-related felonies. *See* Va.Code Ann. § 19.2–163. In the federal system, the Criminal Justice Act ("CJA") allows payments of up to $3500, or more than ten times the amount the Commonwealth provides, for court-appointed counsel. *See generally* 18 U.S.C. § 3006A(d)(2).[12] In addition to benefiting by not incurring the expenses involved in incarcerating Project Exile defendants, the Commonwealth of Virginia actually leases prison space to the federal government to relieve overcrowding at federal facilities caused, at least in some part, by the federal prosecution of state crimes. Finally, it is important to note that the organizers of Project Exile have shifted this significant expense to federal taxpayers without the approval of any

federally-elected official who is politically accountable for the expenditure.

## B. EFFECT ON THE FEDERAL JUDICIARY

In addition to the deleterious effects noted above, Project Exile's potentially negative effect on the federal judiciary is readily apparent. In his year-end report on the federal judiciary to Congress, Chief Justice William Rehnquist warned that "[t]he trend to federalize crimes that traditionally have been handled in state courts ... threatens to change entirely the nature of our federal system." *See* Roberto Suro, *Rehnquist: Too Many Offenses Are Becoming Federal Crimes*, Wash. Post. January 1, 1999 at A2. Although these cases are typically not complex, their quantity alone is gradually making it more difficult to accord both civil and criminal cases possessing a greater federal interest the attention which they are due. For this and other reasons, Chief Justice Rehnquist counsels that the fundamental requisite for federal prosecution of such cases be "demonstrated state failure" to prosecute. *Id.* During the hearing on defendant's motion to dismiss, the Commonwealth's Attorney for the City of Richmond vehemently and, in the Court's opinion, correctly denied that his office lacked the resources to properly accomplish its assigned duties. In light of this capacity and the Chief Justice's warning, the imposition of the substantial burdens attendant to Project Exile on the federal judiciary is particularly unwarranted.

## C. A COMPARISON OF THE MECHANISMS AVAILABLE IN STATE PROSECUTIONS

Supporters of Project Exile argue that the program has substantially contributed to a significant decline in Richmond's homicide rate. *See generally* Carrie Johnson and Mark Holmberg, *Richmond's Homicide Rate Drops*, Rich. Times–Dispatch, January 2, 1999 at A1. While vigorous prosecution of

---

11. Mr. Jones is atypical of most Project Exile defendants in that he has retained counsel to defend him in this prosecution.

12. Indeed, the CJA also provides a streamlined procedure allowing waiver of this limit for complex cases. *See* 18 U.S.C. § 3006A(d)(3).

firearms offenses has undoubtedly contributed to some unascertainable decline in the city's murder rate, there is no compelling reason to suspect that a comparable effort by local prosecutors would not achieve a comparable effect.

As the comparative facts set forth in Part I of the Court's Opinion demonstrate, the Commonwealth of Virginia possesses the same institutional mechanisms necessary to combat the problems Project Exile abdicates to federal prosecutors. The federal and state statutes prohibiting possession of firearms are not markedly different. *See* 18 U.S.C. § 922(g); Va.Code Ann. §§ 18.2–308.1:1 through 308.2:1, and 18.2–308.4. Both proscribe possession of firearms by felons. *See* 18 U.S.C. § 922(g)(10); Va.Code Ann. § 18.2–308.2. Both prohibit persons from possessing firearms during the commission of drug trafficking offenses. *See* 18 U.S.C. § 924(g); Va.Code Ann. § 18.2–308.4. Both attempt to prohibit possession of firearms by drug users, *see* 18 U.S.C. 922(g)(3); Va.Code Ann. § 18.2–308.1:5, and those prone to incidents of domestic violence and abuse. *See* 18 U.S.C. § 922(g)(9); Va.Code Ann. § 18.2–308.1:4. In the Court's experience, nearly all Project Exile defendants are prosecuted under one of the four federal statutes cited above. In each category, the Commonwealth possesses a statute comparable, if not substantively identical, to the federal statutes upon which Project Exile prosecutions are predicated.

In some minor regards, the federal statute proscribing possession by prohibited persons is more exhaustive than its state counterpart. *See, e.g.,* 18 U.S.C. § 922(g)(2) (prohibiting possession by fugitives); 18 U.S.C. § 922(g)(6) (prohibiting possession by persons discharged from the Armed Forces under dishonorable conditions); 18 U.S.C. § 922(g)(7) (prohibiting possession by persons who have renounced U.S. citizenship). But these categories are rarely, if ever, prosecuted under Project Exile. Furthermore, the Court notes that the reason for the absence of analogous state statutes is obvious. Each of these seldom-enforced statutes concerns a category with uniquely federal interests. Accordingly, an examination of the federal and state statutes prohibiting the possession of firearms by certain persons unequivocally establishes that the law of the Commonwealth of Virginia is sufficient to adequately prosecute the same conduct which Project Exile targets for federal prosecution. Thus, the Commonwealth of Virginia suffers no statutory deficiency sufficient to warrant Project Exile.

The federal and state systems are governed by different sentencing provisions. Both have abolished parole. While the basic statutes at issue impose different maximum penalties, the guidelines tend to render these differences immaterial. The statutory maximum provided by federal law is rarely imposed. The United States Sentencing Guidelines assign a base offense level of fourteen for possession of a firearm by a prohibited person. *See* U.S.S.G. § 2k2.1(a)(6). The sentencing guidelines for this base offense level call for a range of imprisonment varying from fifteen to forty-six months, depending upon a defendant's criminal history. *See* U.S.S.G., ch. 5 pt. A. This guideline range is nearly identical to the state statutory penalties of one to five years for possession of firearm by a felon or by a person in possession of controlled substances. *See* Va.Code Ann. § 18.2–308.2., 18.2–308.4, and 18.2–10. Indeed the Commonwealth's "three strikes and you're out" provision, *see* Va.Code Ann. § 53.1–151 B1, generally imposes even more substantial penalties than does the analogous "Armed Career Criminal" provision of the federal guidelines. *See* U.S.S .G. § 4B1.4. Accordingly, an examination of the federal and state sentencing schemes indicates no substantial difference to warrant the abdication of the Commonwealth's law enforcement responsibilities. The Commonwealth therefore appears to possess a sentencing regime sufficient to deter the conduct which Project Exile targets for federal prosecution.

Proponents of Project Exile maintain that pre-trial release from custody is routine during state prosecutions and rare during federal prosecutions. However, the state statute governing pre-trial release is substantively identical to its federal counterpart. Both prohibit the release of a defendant who poses either a substantial risk of failing to appear

or an unreasonable danger to himself or others. *See* 18 U.S.C. § 3142(e); Va.Code Ann. § 19.2–120. Thus, the state statute appears sufficient to detain defendants charged with firearms violations pending trial.

Despite the existence of this statute, testimony from defense attorneys indicates that the Commonwealth rarely opposes pre-trial release in state prosecutions. Any failure in this regard appears more likely attributable to a lack of vigorous advocacy by the Commonwealth's Attorney at this stage of the proceedings. Testimony indicates that the Commonwealth rarely, if ever, opposes pre-trial release at the initial appearance of a defendant in state prosecutions. In fact, the Commonwealth's Attorney for the City of Richmond indicated that he had never sent a prosecutor to the magistrate to oppose pre-trial release of a defendant. Finally, the Court notes that defendant Jones was released on bond during his prosecution in federal court, further discrediting any suggestion that the pre-trial incarceration of defendants is fundamental to Project Exile. Therefore, a close examination of the pre-trial release mechanisms indicates no substantial difference between the capacity of state and federal prosecutors to prevent the pre-trial release of dangerous defendants.

Finally, proponents of Project Exile also maintain that defendants convicted in the federal system are subject to incarceration in federal institutions far removed from Virginia. However, the facts, as they often do, unmask this assertion as yet another myth. Testimony indicates that the Federal Bureau of Prisons selects the location of a convicted defendant's incarceration for reasons independent of those advanced by Project Exile proponents. The vast majority of Project Exile defendants are incarcerated at the Northern Neck Regional Jail while awaiting trial and at the Federal Corrections Institute in Petersburg, Virginia following conviction. The Commonwealth possesses numerous facilities more geographically removed from the City of Richmond than is the federal facility in Petersburg. Thus, contrary to public assertions, Project Exile actually results in incarceration in facilities closer than many available in the state system. Accordingly, the location of incarceration provides no justification for Project Exile.

During his testimony, the Commonwealth's Attorney for the City of Richmond acknowledged that he possessed every institutional tool necessary to effectively prosecute cases currently diverted to federal court under Project Exile. A comparison of the state and federal systems indicates that his assessment is accurate. In every proffered regard, the Commonwealth's arsenal is equally sufficient to redress the local problems that Project Exile surrenders to the federal government for solution. In light of the adequacy of these state provisions, the abdication of responsibility for prosecuting local crime is particularly lamentable.

## IV. CONCLUSION

Despite its laudable purpose, Project Exile represents a substantial federal incursion into a sovereign state's area of authority and responsibility. That the incursion has been acquiesced in, or invited by, state law enforcement officers makes it no less troublesome. Indeed, where, as here, the local authorities claim to have the capacity to address the problem, the invited federal incursion raises serious motivational concerns. An examination of the Commonwealth's statutes suggests that this incursion likely is not necessary. Despite these numerous and substantial objections, however, the judges of the Richmond Division of the Eastern District of Virginia are compelled to conclude that, on the record as made, Project Exile does not violate defendant's right to equal protection as guaranteed by the Fifth Amendment's Due Process Clause.

### ORDER

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on defendant's motion to dismiss the indictment. For the reasons stated in the accompanying Memorandum Opinion, the defendant's motion is DENIED.

Counsel for defendant has also submitted a motion to suppress in this matter. The government is DIRECTED to respond to that

motion within eleven days of entry hereof. Defendant shall reply to the government's response within three days of service. The Defendant is DIRECTED to contact chambers and schedule a hearing on the motion to suppress if one is desired.

It is so ORDERED.