UNITED STATES of America

v.

Beverly A. CLAIBORNE,
Jr., Defendant.

No. Crim.A. 3:99CR297.

United States District Court,
E.D. Virginia,
Richmond Division.

April 14, 2000.

David Maguire, U.S. Attorney's Office, Richmond, VA, for United States.

D. Gregory Carr, Bowen, Bryant, Champlin & Carr, Richmond, VA, Cary B. Bowen, Bowen, Bryant, Champlin & Carr, Richmond, VA, for defendant Claiborne.

## MEMORANDUM OPINION

WILLIAMS, Senior District Judge.

This matter is before the Court on the defendant's Motion to Dismiss the Indictment due to Double Jeopardy and a Violation of the *Petite* policy and the defendant's Motion in Limine to exclude from the indictment several alleged overt acts in furtherance of the conspiracy because the defendant was a juvenile at the time of the alleged acts. For the reasons stated below, both motions are denied.

### I. FACTUAL BACKGROUND

The defendant, Beverly Claiborne, is charged in a twelve-count Superceding Indictment as follows: Count One, Conspiracy, in violation of Title 21 U.S.C. § 846; Counts Two through Six, Possession with Intent to Distribute Crack, in violation of Title 21 U.S.C. § 841(a)(1); Count Seven, Possession with Intent to Distribute Heroin, in violation of Title 21 U.S.C. § 841(a)(1); Count Eight, Distribution of Heroin, in violation of Title 21 U.S.C. § 841(a)(1); Count Nine, Murder in Aid of Racketeering Activity, in violation of Title 18 U.S.C. § 1959(a)(1); Count Ten, Murder in Aid of Drug Trafficking, in violation of Title 21 U.S.C. § 848(e); Count Eleven, Use of Firearm During Crime of Violence, in violation of Title 18 U.S.C. § 924(c); and Count Twelve, Murder During Crime of Drug Trafficking, in violation of Title 18 U.S.C. 924(j). The victim of the murder

that occurred on or about August 7, 1998, alleged in Counts Nine, Ten, and Twelve, was D'Antonio Johnson.

The defendant is allegedly a member of a violent drug gang named the "17th Street Boys." The November 3, 1999 Superceding Indictment alleges that:

[i]n the vicinity of 17th Street, Boston Avenue and Albany Avenue in the Blackwell area of Richmond, Virginia, the "17th Street Boys" operated and controlled an open air drug market, where drug users would either walk or drive up to purchase cocaine base, commonly known as "crack," powder cocaine, and heroin. From 1993 to the present, the defendant and conspirators distributed more that [sic] one hundred kilos of crack and three kilos of heroin.

(Superceding Indictment, Count One, ¶ 2). This amount of drugs has a street value of approximately $10 million dollars. *See* Tom Campbell, *Drug Conspiracy Indictment Unsealed. Five or Six Defendants are in Custody,* Richmond Times Dispatch, Sept. 25, 1999, at B6. The Superceding Indictment further alleges that in order "[t]o further their drug trafficking activities, the defendant and conspirators committed numerous acts of violence and threats of violence upon drug users, rival gang members, residents and anyone who interfered with their drug activities." (Superceding Indictment, Count One, ¶ 3).

The United States is presently seeking a life sentence for the charges against Beverly Claiborne.[1] The defendant was previously tried and acquitted of charges relating to the same events in the Circuit Court for the City of Richmond, Manchester Division, on January 7, 1999. In the Commonwealth of Virginia ("Virginia" or the "Commonwealth") system, the defendant was charged with the first degree murder of D'Antonio Johnson, in violation of Va. Code § 18.2–32; use of a firearm in the commission of murder, in violation of Va. Code § 18.2–53.1; and conspiracy to dis-

---

**1.** Originally, the murder charges, Counts Nine, Ten, and Twelve. were death eligible offenses; however, the United States Attorney

General determined that the United States would not seek the death penalty against this defendant.

tribute heroin, in violation of Va.Code § 18.2–22. The case was prosecuted by Pamela Evans, Esquire, Deputy Commonwealth Attorney for the City of Richmond. At the conclusion of the Commonwealth's case, the trial judge, the Honorable James B. Wilkinson, struck the evidence on the drug conspiracy charge and dismissed that charge. The jury subsequently found the defendant not guilty of the remaining murder and firearm charges.

During the same time period as defendant Beverly Claiborne's trial in the Circuit Court for the City of Richmond, specifically January 19–21, 1997, the United States tried Kenneth Montgomery, allegedly also a member of the "17th Street Boys," in this Court. Montgomery was tried on several charges, including the same conspiracy charge that defendant Claiborne is currently facing, the New Years Eve 1995 murder of John Henry White,[2] and other related charges. Montgomery was found guilty by a federal jury and is serving a life sentence. Montgomery was never tried in state court.

Following his acquittal in the Circuit Court for the City of Richmond on January 7, 1999, the defendant was released from custody and remained free until he was arrested on his initial federal indictment in September 1999.[3] On November 3, 1999, the United States superceded the original indictment, with only Beverly Claiborne as a defendant, and added the various murder charges for the murder of D'Antonio Johnson.

## II. LEGAL ANALYSIS

### A. The Motion to Dismiss the Superceding Indictment due to Double Jeopardy and a Violation of the Petite Policy

The defendant filed a motion to dismiss the November 3, 1999 Superceding Indict-

ment, arguing that federal prosecution on the charges on which he was already tried and acquitted in the Circuit Court for the City of Richmond amounts to a violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and a violation of the *Petite* policy of the United States Department of Justice, as outlined in the *United States Attorney's Manual* § 9–2.031. Although the Court feels that the defendant's Double Jeopardy claim has considerable merit, the Court is reluctant to create a new exception to the dual sovereignty doctrine which allows for federal and state prosecutions without implicating the Double Jeopardy bar. Additionally, under current law, the Assistant Attorney General's decision to waive the *Petite* policy does not have any Constitutional implications and does not confer any rights on the criminal defendant. *U.S. v. Sobral,* 149 F.3d 1172, 1998 WL 276263, at *4 (4th Cir.1998) (unpublished opinion); *see also United States Attorney's Manual* § 9–2.031(F) [hereinafter *Manual*]. Accordingly, the defendant's motion to dismiss is denied.

### 1. The Legal Setting

■ The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. . . ." A well-settled exception to the Double Jeopardy bar is the dual sovereignty doctrine which holds that "the Constitution does not deny the State and Federal Governments the power to prosecute for the same acts." *Rinaldi v. U.S.,* 434 U.S. 22, 28, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977).

In applying the dual sovereignty doctrine, then, the crucial determination is whether the two entities that seek successively to prosecute a defendant for

---

**2.** The murder of John Henry White is unrelated to the August 7, 1998 murder of D'Antonio Johnson for which Beverly Claiborne is currently facing charges.

**3.** The original indictment had thirty-four counts and charged the defendant, Beverly Claiborne, as well as Donald M. Caston, Mar-

lo K. Tucker, Julian D. Leeper, Donnel L. Douglas, and Albert Lee Barnes, with various drug-related crimes. However, the original indictment did not charge Claiborne or any co-defendant with murder. Beverly Claiborne's five co-defendants all reached plea agreements with the United States and entered guilty pleas.

the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power.... Thus the [Supreme] Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute derives from its 'inherent sovereignty,' [preserved to it by the Tenth Amendment], and not from the Federal Government.

*Heath v. Alabama,* 474 U.S. 82, 88–89, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (citations omitted).

■ Currently, the only recognized exception to the dual sovereignty doctrine is the "sham prosecution" exception. This exception applies when federal and state prosecutors are alleged to have manipulated the system in order to achieve the equivalent of a second prosecution in the same sovereign. *See Bartkus v. Illinois,* 359 U.S. 121, 122–24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). To fit under the "sham prosecution" exception, the federal prosecution of Beverly Claiborne would have to be proved to be "a sham and a cover for a [state] prosecution, and thereby in essential fact another [state] prosecution." *Bartkus,* 359 U.S. at 124, 79 S.Ct. 676. If a "sham prosecution" were shown, then the dual sovereignty doctrine would not apply and the defendant's federal charges would be barred by Double Jeopardy.

In direct response to the Supreme Court's creation of the dual sovereignty doctrine, the United States Department of Justice formulated an internal policy, referred to as the *Petite* policy. *Rinaldi,* 434 U.S. at 28, 98 S.Ct. 81 (citations omitted). The *Petite* policy "establishes guidelines for the exercise of discretion by appropriate officers of the Department of Justice in determining whether to bring a federal prosecution based on substantially the same act(s) or transactions involved in a prior state or federal proceeding." *Manual* § 9–2.031(A). *See also Petite v.*

*United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (granting the federal government's motion to vacate a judgment in the district court where the conspiracy to make false statements to an agency of the United States indictment against the defendant arose from the same acts and transactions as a different indictment for suborning perjury). The *Petite* policy further provides:

> This policy precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s) unless three substantive prerequisites are satisfied: first, the matter must involve a substantial federal interest; second, the prior prosecution must have left that interest demonstrably unvindicated; and third, applying the same test that is applicable to all federal prosecutions, the government must believe that the defendant's conduct constitutes a federal offense, and that the admissible evidence probably will be sufficient to obtain and sustain a conviction by an unbiased trier of fact. In addition, there is a procedural prerequisite to be satisfied, that is, the prosecution must be approved by the appropriate Assistant Attorney General.

*Manual* § 9–2.031(A). The *Manual* states that the purpose of the policy is to "vindicate substantial federal interests through appropriate federal prosecutions, to protect persons charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same act(s) or transaction(s), to promote efficient utilization of Department resources, and to promote coordination and cooperation between federal and state prosecutors." *Id.* The *Petite* policy serves to protect interests which, but for the dual sovereignty doctrine, would be embraced by the Double Jeopardy Clause. *Rinaldi,* 434 U.S. at 29, 98 S.Ct. 81.

■ Both the *Manual* and the case law discussing the *Petite* policy have stressed that the policy is for internal use only, is

not Constitutionally mandated, and does not confer any substantive rights on the defendant. *Manual* § 9–2.031(F); *Sobral,* 1998 WL 276263, at \*4 (citations omitted). Further, all federal circuit courts that have considered the question have held that a criminal defendant cannot invoke the policy as a bar to federal prosecution. *Manual* § 92.031(F).

### 2. The Proposed "Joint Sovereign" Exception to the Dual Sovereignty Doctrine

■ The defendant argues that there is a violation of his Constitutional right against Double Jeopardy where, as here, the federal and state law enforcement and prosecutors have a joint purpose in investigating and prosecuting the defendant for the same acts. Although there is no defense allegation that prosecution by the federal government in this case rises to the level of "sham prosecution," the defendant argues for the creation of a new exception to the dual sovereignty doctrine, the "joint sovereign" exception, to forbid such dual prosecutions. The distinction between the existing "sham prosecution" exception and the proposed "joint sovereign" exception is that in a "sham prosecution," one sovereign is fueling the investigation and prosecution of a defendant by another sovereign; however, under the proposed "joint sovereign" exception, the focus is on the *in tandem* investigation and prosecution between the two sovereigns.

Were the proposed "joint sovereign" exception adopted, the facts of several of the charges against Mr. Claiborne would lend themselves to dismissal based on a violation of the Fifth Amendment's Double Jeopardy Clause.[4] The prosecuting Assistant United States Attorney ("AUSA")[5]

reported that he called the Richmond Deputy Commonwealth Attorney assigned to prosecute Beverly Claiborne and offered to make available investigative material about the "17th Street Boys" in order to aid the Commonwealth of Virginia's case against Beverly Claiborne.[6] The chronology of the two trials—the Virginia proceedings against Beverly Claiborne and the United States proceedings against Kenneth Montgomery—further demonstrates the duality of purpose between the federal and state governments in the investigation and prosecution of the "17th Street Boys'" drug conspiracy and related crimes of violence.

However, under existing law, there is no exception to the dual sovereignty doctrine based on the cooperation of federal and state investigations and prosecutions. The dual sovereignty doctrine clearly permits state prosecution followed by a redundant federal prosecution. *See, e.g., Rinaldi,* 434 U.S. at 28, 98 S.Ct. 81. In *Bartkus,* the Federal Bureau of Investigation agent who had conducted the investigation for the United States turned over to the state government all of the evidence he had gathered against the defendant. 359 U.S. at 122–123, 79 S.Ct. 676. The Supreme Court ruled in that case that routine cooperation between state and federal prosecutors was not only permissible, but is the conventional practice between the two sets of prosecutors throughout the country. *Id.* at 123, 79 S.Ct. 676. Therefore, under existing law, there is no exception to the dual sovereignty doctrine for "joint sovereigns" and the defendant's motion to dismiss must be denied.

Contrary to the defendant's assertion that the cooperation between the Virginia and federal investigators and prosecutors

---

**4.** Even if the Court were to dismiss some charges against the defendant based on a Double Jeopardy violation, there are several charges in the that were not alleged or tried in the Virginia system which would therefore remain even after dismissal of Double Jeopardy-barred offenses.

**5.** David T. Maguire, Esquire, the same AUSA that prosecuted Kenneth Montgomery in Jan-

uary 1997, is currently prosecuting Beverly Claiborne.

**6.** The Richmond Deputy Commonwealth Attorney prosecuting Beverly Claiborne declined to avail herself of the United States' offer for information and assistance, apparently erroneously believing that eyewitness testimony would be sufficient to convict.

should provide an exception to the dual sovereignty doctrine, the *Petite* policy, in fact, lists as one of its purposes: "to promote coordination and cooperation between federal and state prosecutors." *Manual* § 9–2.031(A). Additionally, the *Petite* policy actually encourages this cooperation:

> In order to insure the most efficient use of law enforcement resources, whenever a matter involves overlapping federal and state jurisdiction, federal prosecutors should, as soon as possible, consult with their state counterparts to determine the most appropriate single forum in which to proceed to satisfy the substantial federal and state interests involved, and, if possible, to resolve all criminal liability for the acts in question.

*Id.* Further, as discussed above, both the *Manual* and existing case law dictate that the *Petite* policy does not confer substantive rights on a criminal defendant and, as such, cannot be used by a defendant to bar prosecution. *Sobral*, 1998 WL 276263, at *4 (citations omitted); *Manual* § 92.031(F). Therefore, under a *Petite* policy analysis, the defendant's motion also must be denied.

### 3. The Concept of Fairness

Applying a general concept of fairness, the federal prosecution of Beverly Claiborne seems inherently unjust where, as here, the defendant is being "ping-ponged" back and forth between the Commonwealth of Virginia criminal justice system and the United States criminal justice system. This "ping-ponging" of Beverly Claiborne seems fundamentally unfair and is offensive, even to the average citizen.

Although the dual sovereignty doctrine is deeply rooted in tradition, in view of the expansion of the Commerce Clause as it relates to federal crimes, perhaps the dual sovereignty doctrine should be reconsidered. Where the Commerce Clause has been broadly expanded and the line between federal and state crimes has been blurred to allow virtually every crime to be prosecuted in federal court under the auspice of "affecting interstate commerce,"

the rationale of the dual sovereignty doctrine is nullified and thus, the doctrine should be eliminated. *See, e.g.,* Title 18 U.S.C. § 922(g) (making it a *federal* crime to possess a gun if one has been convicted of domestic assault, among other reasons, because the gun has traveled in interstate commerce); Title 18 U.S.C. § 1951 (making it a *federal* crime to rob even a local grocery store because the goods have traveled in interstate commerce).

Under principles of comity, in habeas corpus cases, where it appears that a defendant had a fair hearing at the state level, the United States gives deference to state court rulings and does not replow the same ground. Pursuant to Title 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Title 28 U.S.C. § 2254(d). In interpreting that statutory language, the Fourth Circuit has held that "an application of law to facts is unreasonable only when it can be said that ... a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Green v. French,* 143 F.3d 865, 870 (4th Cir.1998), *cert. denied,* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999).

No one questions the Commonwealth's prosecution of Beverly Claiborne or the fact that an experienced, veteran state trial judge presided over the case. Thus, it would appear that concepts of fairness and comity would require the same deference by the United States in its decision whether or not to re-prosecute a defendant in federal court after a trial in state court as the deference the United States shows to

state prosecutions when addressing habeas corpus petitions.

Despite the Court's reservations, the law is established regarding re-prosecution in federal court after a state court judgment. The dual sovereignty doctrine permits this federal prosecution of Beverly Claiborne, and accordingly the defendant's motion to dismiss must be denied.

### 4. The Racial Composition of the Jury

Although the defendant's motion to dismiss must be denied, the most disturbing factor in the dual prosecution of Beverly Claiborne, an African American, is the variance in the racial composition of the two juries he has faced and will face—the actual Circuit Court for the City of Richmond jury and the probable Eastern District of Virginia, Richmond Division jury. By the simple expedient of changing forums, the prosecuting authority achieves in federal court a jury composition which in the City of Richmond would be forbidden by *Batson*. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

██ The Due Process Clause of the Fifth Amendment secures a defendant's right to equal protection during a federal prosecution. *See, e.g. United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Under the equal protection component of the Fifth Amendment's Due Process Clause, prosecutorial decisions may not be based on arbitrary classifications such as race. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). A long line of United States Supreme Court cases holds that the guarantee of equal protection reaches prosecutorial decisions that affect the racial composition of juries. "A person's race simply 'is unrelated to his fitness as a

juror.'" *Batson*, 476 U.S. at 87, 106 S.Ct. 1712 (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (Frankfurther, J., dissenting)). A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id.* at 85–86, 106 S.Ct. 1712. Litigants are given the right to challenge discriminatory jury selection procedures in order to protect their own equal protection rights, as well as to vindicate the rights of excluded jurors and the community at large. *Powers v. Ohio*, 499 U.S. 400, 406, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

In this case, the variance in the racial composition of the two jury pools, together with the United States' decision to retry Beverly Claiborne for the same acts, create equal protection issues that need to be examined.[7] By bringing the case in federal court, the United States will likely obtain a jury composition that could not exist in the Circuit Court for the City of Richmond absent a *Batson* violation. The Commonwealth of Virginia prosecution of Beverly Claiborne occurred in the Circuit Court for the City of Richmond on January 7, 1999, and the acquittal was decided by a jury composed of eight or nine African–Americans and three or four Caucasians (between sixty-six and seventy-five percent African–American).[8] (Rockecharlie Affidavit ¶ 3). In contrast, the typical jury pool for the Richmond Division of the Eastern District of Virginia is approximately only ten percent African–American.

---

7. The Court does not contend that the jury pool in the Eastern District of Virginia violates any aspect of the Jury Selection and Service Act. *See* 28 U.S.C. §§ 1861–1878. The Jury Selection and Service Act provides a statutory remedy to ensure that all litigants entitled to a trial by jury in federal courts have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division in which

the court convenes. *See* 28 U.S.C. § 1861; *see also Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

8. The typical jury pool for the Circuit Court for the City of Richmond is approximately seventy-five percent African–American. *See U.S. v. Chad Jones*, 36 F.Supp.2d 304, 307 (E.D.Va.1999).

*See U.S. v. Chad Jones,* 36 F.Supp.2d 304, 307–8 (E.D.Va.1999).

■ It has been made clear that a defendant has no right to a jury of any particular racial composition as long as that jury is fairly selected from the jurisdiction it serves. Therefore, "prejudice to the defendant is caused not by where the jury is selected, but instead by how the jury is selected." *Jones,* 36 F.Supp.2d at 311 (citing *De La Beckwith v. State,* 707 So.2d 547 (Miss.1997)). Since the Beverly Claiborne case has yet to come to trial in the Eastern District of Virginia, an allegation of prejudice to the defendant in how the jury was selected is premature at best. However, the Court feels it essential to evaluate whether the defendant's rights have been violated by analyzing the United State's decision-making process and ultimate decision to bring these charges in the federal system after an acquittal by a predominantly African–American state jury.

Under the Department of Justice's *Petite* policy, in order to bring a prosecution based on substantially the same facts as a prior prosecution, the United States must first obtain prior approval from the appropriate Assistant Attorney General. *Manual* § 9–2.031(E). There is currently no judicial review of the Assistant Attorney General's decision, despite the fact that one of the stated purposes behind the *Petite* policy is to "protect persons charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same act(s) or transaction(s) ..." *Id.* § 9–2.031(A).

■ Where a decision by the Assistant Attorney General is not tempered by consideration of the racial disparate impact, the courts should be free to scrutinize the decision. And if the courts are not permitted to review the Assistant Attorney General's decision, the courts should be permitted to make their own determination as to the racial implications, either at the motion of the defendant or *sua sponte* as justice requires.

■ The United States Supreme Court has applied strict scrutiny to classifications that on their face are made on the basis of race. The Supreme Court has declared "that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

■ However, in other contexts when the government action is facially neutral, the challenge to its racial implications is evaluated under a different analysis. In *Washington v. Davis,* the Court made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *Id.* This holding "reaffirmed a principle well established in a variety of contexts." *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. 555 (citing *Keyes v. School Dist. No. 1, Denver, Colo.,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (schools); *Wright v. Rockefeller,* 376 U.S. 52, 56–57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (election districting); *Akins v. Texas,* 325 U.S. 398, 403–404, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945) (jury selection)).

■ Despite the Supreme Court's pronouncement of the necessity of finding discriminatory purpose in the governmental action, courts continue to look at the disparate impact that the governmental action

has on the litigant as well. The Supreme Court has explained that

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Arlington Heights*, 429 U.S. at 265–266, 97 S.Ct. 555 (footnotes omitted). The Court in *Arlington Heights* then created a nonexhaustive list of factors to be considered when determining whether racially discriminatory intent existed in the governmental action or decision. *Id.* at 267–268, 97 S.Ct. 555. This list included such factors as the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, departures from the normal substantive sequence, particularly if the factors usually considered by the decisionmaker strongly favor a decision contrary to the one reached, and the leg-

islative or administrative history of the decision. *Id.*

In Beverly Claiborne's case, the AUSA's petition to the Assistant Attorney General to request authorization to prosecute Beverly Claiborne on federal murder and firearms charges and thus for a waiver the *Petite* policy cites numerous reasons why there is a "substantial federal interest" in bringing the federal prosecution against Beverly Claiborne.[9] The AUSA details the existence of additional evidence not available at the time of the Commonwealth's trial and argues that federal prosecution will further the federal interest of stopping gang and drug-related violence.[10] However, nowhere in the correspondence does either the AUSA or the Assistant Attorney General address the racial composition of the Richmond jury as compared to the statistically probable federal jury, the racial implications this may have because the defendant is African–American, or the disparate impact that may result.

■ The disparate impact and discriminatory purpose analysis used in many legal contexts can be applied to this case at two different decision-making stages.[11] First, there was the AUSA's decision to *petition* for a waiver of the *Petite* policy and his discretion to *bring* the prosecution; and second, there was the Assistant Attorney General's decision to *waive* the *Petite* policy and *allow* the subsequent federal prosecution to go forward. As the petition was written by the AUSA to the Assistant Attorney General, there is no mention of race—no mention that the defendant is African–American and no mention of the

---

9. The Court was permitted to review the AUSA's correspondence with the Assistant Attorney General *in camera*.

10. The AUSA gives other worthy arguments in favor of federal prosecution of Beverly Claiborne and a waiver of the *Petite* policy. However, this correspondence was reviewed *in camera* and the Court will respect the confidential nature of the correspondence.

11. The Court notes that this case does not fit squarely within the selective prosecution

analysis because this case involves not only the decision to prosecute the defendant in federal court, but also the decision to waive the *Petite* policy. For a discussion of selective prosecution, see *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Therefore, two potential Constitutional violations are involved, the Double Jeopardy Clause and the Due Process Clause of the Fifth Amendment, and thus these facts deserve additional scrutiny.

statistical difference in the racial compositions of the state and federal juries. On one hand, this absence is laudable because the ultimate decision to waive the *Petite* policy by the Assistant Attorney General was a color-blind decision made without regard to race, and no discriminatory purpose can be attributed to the Assistant Attorney General.

However, on the other hand, the decision to continue the investigation after the Richmond jury's acquittal and the decision by the AUSA to ask for the *Petite* policy waiver was not a color-blind decision. The statistics on City of Richmond and the Richmond Division of the United States District Court for the Eastern District of Virginia jury pools are well-known to prosecutors. Despite these statistics, in this case absolutely no discriminatory purpose has been shown to be attributable to the AUSA in his decision to prosecute Beverly Claiborne. In fact, based both on his statements in open court and upon review *in camera* of his petition to the Assistant Attorney General, the Court is confident that the AUSA's decisions to ask for a *Petite* policy waiver and to prosecute the defendant in federal court were solely to vindicate the federal interest of stopping gang and drug-related violence. Therefore, the government's purpose was completely nondiscriminatory. Although the racial implications and the disparate impact cannot be disputed, the Court concludes that racial discrimination was not a motivating factor in the government's decision.

In this case, as explained above, the United States' decision to prosecute was made without a discriminatory purpose. However, the Court can imagine circumstances where a similar decision to reprosecute might be made with a discriminatory purpose, especially given the statistics on the racial composition of federal and state juries in the Richmond Division of the Eastern District of Virginia and the City of Richmond. Even though the facts and the victims of the Beverly Claiborne and Kenneth Montgomery cases are different, they both involve the "17th Street Boys," drugs, and murder. The Court can imagine a situation where a federal prosecutor would compare the federal jury's guilty verdict against Kenneth Montgomery with the Richmond jury's not guilty verdict against Beverly Claiborne, and together with the statistics on jury compositions, might decide to retry Beverly Claiborne in federal court, hoping to get the desired conviction.

Because there is the possibility of racial discrimination in the decision to bring federal charges after a state acquittal on substantially the same acts, the Court urges that the decision by the Assistant Attorney General should be an informed decision and should include all of the facts, including any racial implications the dual prosecution may have. Since the local AUSA has the most access to and knowledge of local racial implications (such as the statistical jury compositions in the Richmond area's state and federal courts), it is essential that he be required to detail this information in his petition for a waiver of the *Petite* policy. Once the Assistant Attorney General has this information, then the decision whether or not to prosecute can be made and any possible discriminatory purpose and/or disparate impact can be analyzed and weighed against any substantial federal interest. This would provide a check on any possible discriminatory motive in the AUSA's request to prosecute.

Further, since race discrimination is such a significant Constitutional issue, the AUSA's request for a waiver and the Assistant Attorney General's decision to waive the *Petite* policy should also be subject to judicial review through an *in camera* review of the documents. And if judicial review of documents is not available, it would be appropriate for the district judge to order an evidentiary hearing requiring the government to justify a waiver of the *Petite* policy. Absent more comprehensive scrutiny then it is presently afforded, there exists no means to ensure that this substantial discretion is constitutionally exercised. Under the current system, defen-

# 514

dants' rights may be violated on a non-reviewable basis by ping-ponging them back and forth between different legal systems in order to get the desired jury composition.

However, in Beverly Claiborne's case, the decision to waive the *Petite* policy was made strictly in accordance with the procedures in the *United States Attorney's Manual.* Further, the AUSA prosecuting Beverly Claiborne has been forthcoming in providing the Court an *in camera* review of the documents setting forth the motives behind the decision to prosecute in federal court, and upon review of the documents no discriminatory purpose can be found. Therefore, the charges against Beverly Claiborne cannot be dismissed due to any violation of the Double Jeopardy Clause, the United States Department of Justice's *Petite* policy, a general concept of fairness, or the Due Process Clause of the Fifth Amendment to the United States Constitution.

### B. The Defendant's Motion in Limine to Exclude from the Superceding Indictment Several Alleged Violent Overt Acts in Furtherance of the Conspiracy because the Defendant was a Juvenile at the Time of the Acts

The defendant also moves to exclude certain overt acts alleged in the Superceding Indictment because these acts were allegedly committed while Beverly Claiborne was a juvenile. The defendant's Addendum to Motion in Limine clarifies that the alleged overt acts that he is seeking to exclude from evidence, as listed in the Superceding Indictment, are Overt Act numbers 4, 5, 6, 7, 8, 9, and 12.[12] The defendant asserts that he was a juvenile at the time the alleged overt acts were committed, and thus evidence supporting them should be excluded because the probative value is substantially outweighed by the

12. The defendant filed his Motion in Limine on October 18, 1999. After being arraigned on the original indictment, the government obtained a Superceding Indictment on November 3, 1999 which contained additional alleged overt acts. As a result, the numbers

prejudicial impact. The defendant's argument encompasses both Rule 404(b) and Rule 403 of the Federal Rules of Evidence. The Court disagrees and for the following reasons denies the defendant's Motion in Limine.

 Although the government may not prosecute an individual presently under age twenty-one for conduct prior to age eighteen without going through the formalities of the Federal Juvenile Delinquency Act, Title 18 U.S.C. § 5031, *et seq.*, the government may nonetheless prosecute an adult for participation in a conspiracy that began prior to the accused's eighteenth birthday, and that continued past his eighteenth birthday, provided that the defendant engaged in some overt act indicating his *ratification* of the conspiracy after attaining his majority. *United States v. Spoone*, 741 F.2d 680, 687 (4th Cir.1984); *United States v. Strothers*, 77 F.3d 1389, 1391–1392 (D.C.Cir.1996). Adult ratification of a criminal conspiracy begun as a juvenile is analogous to the civil law concept of adult ratification of a contract made as an infant. *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir.1991). The accused may not be held criminally liable, however, for acts in furtherance of the conspiracy committed prior to age eighteen. *Maddox*, 944 F.2d at 1233. Evidence of such acts may only be admitted for the limited purpose of putting the accused's subsequent post-eighteen conduct within the context of the conspiracy. *Id.* Evidence of the juvenile acts may not be considered as substantive evidence of guilt. *Spoone*, 741 F.2d at 687.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However Rule 404(b) also provides an exception to

of the original alleged overt acts have changed. In his Addendum to Motion in Limine, the defendant clarifies that he is seeking to exclude the re-numbered alleged overt acts as well as two alleged overt acts that were added in the Superceding Indictment.

the general inadmissibility of such evidence, stating that such evidence is admissible when it is offered for some other valid purpose, "... such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Federal Rule of Evidence 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

In this case, the alleged violent overt acts are intrinsic to the Conspiracy charged in Count One, pursuant to Title 21 U.S.C. § 846, and thus do not implicate Rule 404(b). Such acts are intrinsic when they are "inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Chin,* 83 F.3d 83, 88 (4th Cir. 1996). The alleged threats of violence, shootings, beatings, and murder were all part and parcel of the defendant's attempts to keep the drug business of the "17th Street Boys" operating smoothly and without interference, and thus Rule 404(b) is not applicable to the acts the defendant seeks to exclude.

Even if Federal Rule of Evidence 404(b) was applicable, the alleged overt acts in question are subject to the exception. Evidence of prior crimes or bad acts is admissible under Rule 404(b) if it is: 1) offered to prove a *relevant* issue and not to establish the general bad character of the defendant; (2) *necessary* to prove an essential element of the offense; (3) *reliable,* and (4) has *probative value* which is not outweighed by its potential for confusion or prejudice. *United States v. Powers,* 59 F.3d 1460, 1464 (4th Cir.1995); *United States v. Queen,* 132 F.3d 991, 997 (4th Cir.1997). In the Beverly Claiborne case, the alleged violent overt acts are admissible because they are: 1) *relevant* because they tend to prove the defendant's knowledge of and involvement in the conspiracy; 2) *necessary* because they demonstrate the defendant's heightened involvement in the

conspiracy as a protector and not just as a drug dealer; 3) *reliable* based on the alleged eyewitness testimony of multiple witnesses. Finally, the probative value of the evidence outweighs any prejudice and therefore the evidence is admissible pursuant to Federal Rule of Evidence 403 and 404(b).

Further, once this case goes to trial, the Court will give a limiting instruction to the jury regarding the alleged overt acts evidence that occurred prior to the defendant's eighteenth birthday. *Spoone,* 741 F.2d at 687. Accordingly, the defendant's Motion in Limine is denied.

### III. CONCLUSION

For all of these reasons, the Court denies the defendant's Motion to Dismiss the Indictment due to Double Jeopardy and a Violation of the *Petite* policy, and the Court denies the defendant's Motion in Limine to exclude from the indictment several alleged overt acts in furtherance of the conspiracy because the defendant was a juvenile at the time of the alleged acts.

An appropriate Order shall issue.

### ORDER

This matter is before the Court on 1) the defendant's Motion to Suppress; 2) the defendant's Motion in Limine; 3) the defendant's Motion for Early Disclosure of Jencks and Giglio Material; 4) the defendant's Motion for Additional Peremptory Challenges for the Defendant; 5) the defendant's Motion to Require the Government to Divulge Criminal Record Check of Jury Panel in Advance of Trial; 6) the defendant's Motion for the Court to Direct the Early Provisions of Proposed Venire Panel; 7) the defendant's Motion for Discovery and Inspection; and 8) the defendant's Motion to Dismiss the Indictment due to Double Jeopardy and a Violation of the *Petite* policy.

For the reasons stated in the accompanying Memorandum Opinion, the Court DENIES the defendant's Motion in Limine and the Court DENIES the defendant's Motion to Dismiss the Indictment

due to Double Jeopardy and a Violation of the *Petite* policy.

For the reasons stated from the bench on March 24, 2000, the Court DENIES the defendant's Motion for Additional Peremptory Challenges for the Defendant; GRANTS the defendant's Motion for the Court to Direct the Early Provisions of Proposed Venire Panel and ORDERS that the venire panel be prepared for the defendant one (1) week prior to trial.

For the reasons stated during the hearing on March 24, 2000, the defendant's Motion to Suppress is MOOT because it was WITHDRAWN; the defendant's Motion for Early Disclosure of Jencks and Giglio Material is MOOT because it was resolved between the parties; the defendant's Motion to Require the Government to Divulge Criminal Record Check of Jury Panel in Advance of Trial is MOOT; and the defendant's Motion for Discovery and Inspection is MOOT.

It is so ORDERED.

Let the Clerk send a copy of this Order and the accompanying Memorandum Opinion to all counsel of record.